Revised May 3, 1999

# UNITED STATES COURT OF APPEALS
## For the Fifth Circuit

No. 97-50367

VICTORIA RIZZO,

Plaintiff-Appellee,

VERSUS

CHILDREN'S WORLD LEARNING CENTERS, INCORPORATED, doing
business as CWLC, Incorporated,

Defendant-Appellant.

Appeal from the United States District Court
for the Western District of Texas

April 15, 1999

Before WISDOM, WIENER, and DENNIS, Circuit Judges.

WISDOM,  Circuit Judge.

Children's World Learning Center (CWLC) is a school and daycare-provider for young children.  Victoria Rizzo is a hearing-impaired woman who, until the circumstances of this lawsuit arose, was an employee of CWLC.  In 1993, Ms. Rizzo left CWLC after a substantial change in her employment duties, and shortly thereafter filed a discrimination claim against CWLC under the Americans with Disabilities Act (ADA)  42 U.S.C. § 12101 et seq.  Rizzo asserted that she had been demoted solely because of her hearing impairment.  CWLC filed a motion for summary judgment that the district court granted.  We reversed the district court and remanded for trial in Rizzo v. Children's

World Learning Centers, Inc.[1] (<u>Rizzo I</u>).

At trial, the jury found that CWLC had discriminated against Rizzo because of her disability, in violation of the ADA. CWLC appeals, asserting the following assignments of error. (1) The district court erred in denying CWLC's motion for judgment as a matter of law, in that Rizzo failed to meet her burden of proof. (2) The district court erred in denying CWLC's motion for judgment as a matter of law, in that defendant CWLC conclusively proved an affirmative defense, specifically that Rizzo posed a "direct threat" to the children in her care. (3) The district court erred in denying CWLC's motion for a new trial, in that the verdict was against the great weight of the evidence. (4) The charge presented to the jury contained plain error, in that it placed the burden of proof on both parties. (5) The award of $100,000 for past and future mental anguish is clearly erroneous, asserting that it is excessive and not supported by competent evidence or causally linked to a violation of the ADA. CWLC seeks either judgment as a matter of law, a new trial, or a reversal as to damages.

Appellee Rizzo now asserts that CWLC's appeal is frivolous and seeks sanctions against the appellant. Further, Rizzo seeks attorneys' fees on appeal, should she be found to be the prevailing party.

We affirm the jury verdict and award. We also find this appeal is not frivolous, and therefore not subject to sanctions. We further award attorneys' fees to the appellee in the amount of $20,625.

Facts

The facts of this case are hotly disputed. This dispute led to our reversal of summary judgment in <u>Rizzo I</u>. There were genuine material issues of fact that needed to be determined at trial.

---

[1] 84 F.3d 758 (5th Cir. 1996).

Victoria Rizzo was an administrative aid at the Children's World Learning Center. She suffers from a substantial hearing impairment. Among her other duties, Rizzo regularly drove students to and from school in a van provided by CWLC. In 1993, a parent of one of CWLC's students complained that her child had been unable to get Rizzo's attention because of her hearing disability. This parent also voiced a concern that Rizzo's disability might prevent her from hearing a choking child while driving a van full of small children. Shortly after this complaint, Rizzo was removed from her van driving duties. She additionally suffered a reduction in work hours, was forced to work a "split-shift" to make up those lost hours (working two short shifts, one in the early morning, the other in the late afternoon), was assigned to cook meals in the Center's kitchen, and on several occasions worked fewer than the necessary hours to keep her benefits (though her benefits were never, in fact, revoked). After these changes in her work assignments, Rizzo quit her job at CWLC, and filed suit under the ADA, alleging discrimination due to her hearing disability.

Rizzo contends that the changes in her employment duties constituted a demotion based solely on her disability. CWLC denied this charge, contending that the change in duties was a natural part of a daycare work environment. CWLC further contends that it was necessary to remove Rizzo from her van driving duties because she posed a direct threat to herself and the children in her care. All of these issues were fully litigated before a jury. That jury found CWLC had violated the ADA by discriminating against Rizzo based on her disability; that such discrimination was done with malice; and that Rizzo was entitled to damages in the amount of $100,000 for past and future mental anguish. CWLC timely filed this appeal.

## Jurisdiction

The district court had jurisdiction of this federal question litigation under Title I of the

3

Americans with Disabilities Act. 42 U.S.C. § 12101 et seq. This court has jurisdiction over a direct appeal arising from such litigation.

Burden of proof and judgment as a matter of law

We shall address the appellant's first two assignments of error together. CWLC first contends that the district court erred in denying appellant's motion for judgment as a matter of law, asserting that Rizzo failed to meet her burden of proof. CWLC next contends that the district court erred in denying the motion for judgment as a matter of law in that CWLC conclusively proved that Rizzo posed a "direct threat" to the children in her care, an affirmative defense to an allegation of discrimination.

As these two assignments of error intertwine around the issue of the burden of proof, we shall address them together. The question is twofold: first, did Rizzo pose a direct threat to the children in her care; second, is it CWLC's burden to prove she was a threat, or is it Rizzo's burden to prove she was not? At first glance both the caselaw from the different federal circuits and the federal regulations themselves appear to be in conflict.

CWLC maintains that Rizzo, as a plaintiff, must prove that she is "a qualified individual with a disability," pursuant to 42 U.S.C. 12112(a). CWLC also maintains that, as part and parcel of proving she is a qualified individual with a disability, Rizzo must prove that she does not pose a direct threat to the health or safety of herself or others. In support of this contention, CWLC points to a holding of the Eleventh Circuit, stating that "the employee retains at all times the burden of persuading the jury... that he was not a direct threat."[2] In so holding, the Eleventh Circuit relied upon a provision of the Interpretive Guidance to 29 CFR 1630.2(r). This states: "An employer may

---

[2] Moses v. American Nonwovens, Inc. 97 F.3d 446, 447 (11th Cir. 1996).

require, as a <u>qualification standard</u>, that an individual not pose a direct threat to the health or safety of himself/herself or others" (emphasis added). As this "qualification standard" obviously goes to the isssue of whether plaintiff is a "qualified individual with a disability," the burden of proof would apparently fall on the plaintiff.

Appellee Rizzo responds that CWLC as the defendant bears the burden of proving "direct threat" as an affirmative defense. In support of this position, Rizzo cites our own statement in <u>Rizzo I</u>, that "as with all affirmative defenses, the employer bears the burden of proving that the employee is a direct threat". Just as the Eleventh Circuit's holding in <u>Moses</u> was based on the Interpretive Guidance to the Code of Federal Regulations, so too was our holding in <u>Rizzo I</u>. Specifically, that "with regard to safety requirements that screen out or tend to screen out an individual with a disability or a class of individuals with disabilities, an employer must demonstrate that the requirement, as applied to the individual, satisfies the "direct threat" standard." Interpretive Guidance to 29 CFR 1630.15 (b) & (c).[3] Rizzo contends that this is law of the case, and dispositive of the issue of burden of proof. We agree. Further, we find that upon a thorough reading of the caselaw and the regulations, there is, in fact, no conflict at all.

The law of <u>Rizzo I</u>, putting the burden of proof on the defendant, applies only in cases concerning "safety requirements that screen out or tend to screen out an individual with a disability or a class of individuals with disabilities."[4]

In the instant case, the record reflects that CWLC demoted Rizzo based on what they perceived to be her inability to hear a choking child while driving a van full of children. Upon this

---

[3] See <u>Rizzo I</u> at 764.

[4] <u>Id.</u>

5

Court's observation that there is no evidence that a choking child even makes a sound, CWLC amended its position, now contending that Rizzo's true "direct threat" to the safety of the children lay in her inability to distinguish spoken words and specific sounds. The record is replete with evidence that Rizzo heard the word "death" as "luck," the word "pain" as "chain," and so forth.[5] In other words, the safety requirement instituted by CWLC was that any teacher whose responsibilities included van driving be able to discriminate spoken words. This is obviously a safety requirement which tends to screen out a class of individuals with hearing disabilities. In such a case, the defendant now bears the burden of proof that the employee poses a direct threat to the health or safety of herself or others.[6]

We therefore agree with the Eleventh Circuit that the burden of proof is on the plaintiff to prove that, as a qualified individual, she is not a direct threat to herself or others. We disagree with the <u>Moses</u> opinion only insofar as that opinion allows for no exceptions to this rule. (The employee retains the burden <u>at all times</u>..." <u>Moses</u> at 447)(emphasis added). We hold that, in accord with the federal regulations, when a court finds that the safety requirements imposed tend to screen out the disabled, then the burden of proof shifts to the employer, to prove that the employee is, in fact, a direct threat.

Working now with an understanding that, in the case at bar, defendant-appellant CWLC has the burden of proof, we may fully address their assignments of error. Did the district court err in

---

[5] See Defendant's Exhibit 51, p.55

[6] For example, had CWLC instituted a "safety requirement" that any teacher whose responsibilities included van driving also be a state-certified teacher with a minimum of a bachelor's degree in education, the burden in such a case would remain on the plaintiff to prove that she is not a direct threat. It is the nature of the safety requirement itself, and whether it tends to screen out the disabled, that determines if the burden of proof should shift to the defendant.

6

denying the motion for judgment as a matter of law?  We view the evidence in the light most favorable to the non-movant,  and ask, could a reasonable juror have found for the plaintiff?[7]

To prevail under the ADA, the plaintiff must prove three things: (1) she has a disability; (2) she is an otherwise qualified employee; and (3)  she suffered an adverse employment decision solely because of her disability.

Both parties have stipulated that Rizzo suffers a disability.

Was Rizzo an otherwise qualified employee?  CWLC contends that Rizzo could not safely drive the school van, and that she was therefore not qualified.  We have already established that the burden of proof that Rizzo constituted a direct threat falls on the appellant.  Again, the issue is intertwined with CWLC's assertion that it  proved, as a matter of law, that Rizzo was a direct threat to others.  We disagree.  There is no evidence in the record that Rizzo ever had any problems driving the van.  There is no evidence of a previous accident, or even a previous near-miss.  There is no evidence that her disability resulted in her being distracted from her driving duties.  CWLC points out that, as Rizzo would be unable to hear the children in the van, she would have to rely on the additional mirrors placed in the van for visual clues as to the children's safety.  CWLC contends that this would tend to distract Rizzo, and could result in an accident.  There is no evidence that the mirrors were placed in the van to accomodate Rizzo.  These mirrors were there so that <u>any</u> van driver, with or without a disability, could check on the children visually.  This was a necessary step since it would be enormously difficult for <u>anyone</u> to distinguish words  in a van filled with up to two dozen children.

With regard to her other duties, there is no  evidence Rizzo was not qualified.  As an

---

[7] <u>Boeing Co. v. Shipman</u> 411 F.2d 365, 374 (5th Cir. 1969)(en banc).

administrative assistant she appears to have completed successfully all her other duties, including answering the telephone, despite her hearing loss. CWLC's only problem with Rizzo appears to have been what they perceived as a potential threat in the area of van driving.

Finally, Rizzo must prove that she suffered an adverse employment decision solely because of her disability. CWLC contends that Rizzo suffered no adverse employment decision. They blame the reduction in Rizzo's work hours on the seasonal nature of daycare work. They point out that other teachers shared in the cooking duties along with Rizzo. They contend that Rizzo's change in duties was based on her own request not to be alone in the classroom with children for an extended period. In short, CWLC contends that Rizzo was never demoted.

Viewing the evidence in the light most favorable to the appellee, we must disagree. Rizzo's hours were reduced, resulting in lost wages. To compensate for the reduction, Rizzo was forced to work a split-shift of early mornings and late afternoons. Even with the split-shift she was not working enough hours to keep her full benefits package (though we recognize that she never actually lost her benefits). She was removed from her duties as the van driver, and sent to work in the kitchen. The cook replaced her as the van driver. In the light most favorable to Rizzo, a reasonable juror could clearly find she was demoted.

While not conceding a demotion, CWLC argues that, in the alternative, the record will clearly show such a demotion was not based solely on her disability. CWLC re-urges its previous arguments: that the work was seasonal; that everyone cooked; that Rizzo asked not to perform certain duties. Mainly, CWLC asserts that driving the van was not an essential part of Rizzo's duties, so suspending her from van driving was not a demotion based on her disability. We disagree. Rizzo's duties included driving the van every day. We remind CWLC, and all appellants, that a motion for

8

judgment as a matter of law does not require this Court to decide which side has the better of the case. "It is the function of the jury as the traditional finder of the facts, and not the Court, to weigh conflicting evidence."[8] Clearly, a reasonable juror could conclude that driving the van was an essential part of Rizzo's job, and CWLC offers no grounds for her suspension from that duty other than her disability.

CWLC's final argument is that this Court should recognize the "unique circumstances" of this case, and adopt an equally unique "balancing test" to fit the facts of the case. CWLC contends that a school and daycare facility must make the protection of the children their primary concern. With that in mind, they propose that this Court determine whether CWLC "properly balanced the need to protect the children in its care and Rizzo's interest in continued employment at the Learning Center".[9] We decline to adopt such a balancing test. We recognize CWLC's interest in protecting the children in their care. We must also recognize that the evidence produced at trial shows only speculation as to the threat that could be posed by an employee with a disability who had been safely doing her job for two years.

Congressional intent with regard to the ADA is clearly spelled out: "To provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities."[10] Had Congress intended this Court to apply a balancing test in evaluating a discrimination claim, the Code of Federal Regulations would have made that plain. Yet CWLC provides us with no statutory authority for the test they propose. As such a test has no basis in either

---

[8] Id.

[9] Appellant's Brief at page 23.

[10] 28 U.S.C. 12101 (b)(1).

9

the regulations or the caselaw, and is not mandated by the interests of justice, we decline to adopt such a test.

Having reviewed the record in the light most favorable to Rizzo, we conclude that a reasonable jury could have found for the plaintiff, and affirm the trial court's denial of the amended motion for judgment as a matter of law.

## Motion for a new trial

Appellant CWLC alternatively argues that the verdict of liability was against the great weight of the evidence, and that the district judge abused his discretion in denying the motion for a new trial.

The arguments of the parties concerning this assignment of error are identical with those made regarding judgment as a matter of law, and need not be rehashed in detail here. After viewing the evidence in the light most favorable to Rizzo, we cannot conclude that the district judge abused his discretion in denying the motion for a new trial.

## The jury charge

As we have noted throughout this opinion, the law regarding the burden of proof on the issue of "direct threat" appears to have been in conflict until now. CWLC now asserts as error that the district court mistakenly assigned the burden of proof of "direct threat" to both parties. CWLC further contends that by doing so, the district court caused substantial prejudice to the parties.

CWLC concedes in their brief that they failed to raise this issue before the district court, and now raise it for the first time on appeal.[11] Because the error is raised for the first time on appeal, we review for plain error affecting substantial rights of the parties, reversing only if the error would

---

[11] Appellant's Brief at page 35.

10

"seriously affect the fairness, integrity, or public reputation of judicial proceedings".[12]

First we examine if there was error in the district court's charge. The district court properly assigned to Rizzo the burden of proving she was a "qualified individual with a disability". In defining that phrase, the court instructed that "the phrase... describes a person who, with or without reasonable accomodation, can perform the essential functions of the employment position that the plaintiff holds or desires and who does not pose a "direct threat"to the health or safety of herself or others".[13]

In the very next charge, the court further instructed the jury that "the defendant has asserted that the plaintiff was removed from driving the school van because her employment as a school van driver posed a "direct threat" to the health or safety of herself or others. (The court then defined "direct threat" concluding with the following:) The defendant has the burden to prove by a preponderance of the evidence that a direct threat exists."[14] The instructions, like the caselaw and the regulations, appear to conflict.

As we have noted before, however, "few jury charges in cases of complexity will not yield error if pored over, long after the fact, in the quiet of the library --- if such an enterprise is to be allowed. It is not."[15] Appellant's failure to raise this issue before the district court leaves CWLC with the demanding standard of an error which would "seriously affect the fairness, integrity, or reputation

---

[12] United States v. Olano, 507 U.S. 725, 736 (1993).

[13] Record at 601.

[14] Record at 602.

[15] Highlands Ins. v. National Union Fire Ins., 27 F.3d 1027, 1032 (5th Cir. 1994)

11

of judicial proceedings".[16] We find the conflicting charges do not meet this standard. "Reversal for plain error is "not a run of the mill remedy" and will occur "only in exceptional circumstances to avoid a miscarriage of justice."[17] We find no such exceptional circumstances here.

## Damages

Appelant CWLC's final contention is that a damage award of $100,000 for past and future mental anguish is excessive in view of the record. We overturn such an award only upon a finding that the amount awarded is "clearly erroneous".[18]

CWLC suggests that the district court's finding that Rizzo suffered $182 in lost wages is an indication that $100,000 for past and future mental anguish is excessive. The $100,000 award may be generous in relation to the lost wages, yet mental anguish is an actual compensatory damage. We note that the jury, having found CWLC acted with malice, could have further inflicted punitive damages on the appellant, and chose not to do so. In short, we cannot say that an award of $100,000 for mental anguish resulting from malicious discrimination in violation of the ADA is enough to "shock the conscience" of this Court.[19]

## Appellee' contentions

Having found in favor of the appellee on both liability and damages, we must now address appellee's contention that CWLC's appeal is frivolous, and should result in sanctions. This appeal

---

[16] Olano at 736.

[17] Highlands Ins. v. National Union Fire Ins. 27 F.3d 1027, 1032 (5th Cir. 1994) quoting Peveto v. Sears, Roebuck, & Co. 807 F.2d 486, 489 (5th Cir 1987).

[18] Hernandez v. M/V Rajaan 841 F.2d 582, 587, rehearing denied en banc 848 F.2d 498 (5th Cir. 1988).

[19] Smith v. Piedmont Aviation, Inc. 567 F.2d 290, 292 (5th Cir. 1978).

12

is far from frivolous. Rizzo correctly points out that our prior holding in <u>Rizzo I</u> stated the law of the case as to certain issues raised again on this appeal. The most notable issue raised concerns the burden of proof of "direct threat". CWLC appears to have relied in good faith on what they felt to be conflicting caselaw from the Eleventh Circuit, and we will not penalize the appellant for bringing this issue before the Court.

As a prevailing party in a suit filed under the ADA, Rizzo is entitled to the attorneys' fees awarded by the district court.[20] Additionally, "a long and consistent line of Fifth Circuit precedent allows awards of attorneys' fees for both trial and appellate work".[21] At oral argument, counsel for Rizzo asserted that each partner had worked 75 hours on this appeal. Counsel further stated that the district court had ordered attorneys' fees in the amount of $175 an hour for senior counsel, and $100 an hour for junior counsel. On that basis, we determine that Rizzo is entitled to attorneys' fees in the amount of $20,625. These fees are to be paid by CWLC.

The judgment of liability and the award of damages are AFFIRMED. Attorneys' fees are awarded in accord with this opinion.

---

[20] 42 U.S.C. 12117 and 42 U.S.C.2000e-5(k).

[21] <u>Norris v. Hartmax Specialty Stores, Inc.</u> 913 F.2d 253, 257 (5th Cir. 1990).

WIENER, Circuit Judge, dissenting:

Because I believe that Ms. Rizzo's failure to provide the Children's World Learning Center's, Inc. ("CWLC") with a report from her audiologist demonstrating that she could safely supervise the children entrusted to her care while driving a van constituted a breakdown in the interactive process required under the ADA sufficient to preclude her claims under that Act, I respectfully dissent. Moreover, although I applaud the majority's attempt to reconcile Congress' confusing and at least potentially conflicting commands regarding which party bears the burden of proving whether the plaintiff poses a direct threat to the health or safety of herself or others, I am constrained to disagree. I believe that, consistent with this Circuit's implicit holdings in Chandler v. City of Dallas,[22] and Daugherty v. City of El Paso,[23] and the First Circuit's explicit holding in Equal Employment Opportunity Commission v. Amego,[24] when an employee plaintiff is responsible for ensuring the safety of others entrusted to her care as part of her essential job duties, she bears the initial burden of proving that she can perform those duties in a way that does not endanger others. If she cannot sustain this burden, she cannot show that she is an "otherwise qualified individual with a disability," an indispensable element of her prima facie case.[25]

I.

---

[22]2 F.3d 1385 (5th Cir. 1993).

[23]56 F.3d 695 (5th Cir. 1995).

[24]110 F.3d 135 (1st Cir. 1997).

[25]As we noted in Rizzo v. Children's World Learning Centers, Inc., 84 F.3d 758 (5th Cir. 1996) (Rizzo I), to prevail on her ADA claim, Rizzo must prove that (1) she has a disability; (2) she was qualified for the job; and (3) an adverse employment decision was made solely because of her disability. Id. at 763.

Facts

As the majority opinion sets forth the factual background of this case, I will only briefly revisit that terrain, placing particular emphasis on the CWLC and Rizzo's interaction regarding the need for a report from Rizzo's audiologist certifying that she could safely monitor the children while driving the van. Rizzo began working at CWLC as an assistant teacher in March 1991, instructing four and five year olds. She has a hearing impairment that requires the use of hearing aids, of which she informed CWLC when she first applied for a position. Her duties at CWLC included assisting in the classroom, doing administrative paperwork, and driving children in the CWLC van.

In February 1993, a parent of one of CWLC's students observed an incident in a classroom, in which her son was unable to get Rizzo's attention despite repeatedly yelling her name.[26] The parent complained to CWLC director Myra Ryan about Rizzo's being left alone with children and expressed concern over Rizzo's ability to drive the van safely. When Ryan advised Rizzo of the complaint and discussed it with her, Rizzo admitted that she had experienced further hearing loss over the course of her employment with CWLC and was scheduled to see her audiologist. Ryan asked Rizzo whether her hearing loss would prevent her from hearing emergency sirens or a choking child in the back of the van. Rizzo responded that she could hear sirens, but that she did not know if she could hear a choking child. Following this meeting, Ryan temporarily removed Rizzo from her driving responsibilities until Rizzo could provide confirmation from an audiologist that she could (1) hear emergency vehicle sirens, and (2) safely supervise children while driving a van.[27]

---

[26]This was, in fact, the second complaint by a parent stemming from Rizzo's inability to hear a child who was attempting to get her attention.

[27]Rizzo contends that CWLC's argument that a parent's complaint prompted her removal was fabricated. She bases this assertion on the fact that, in writing a letter to CWLC documenting the

15

In March 1993, Rizzo gave Ryan a report from the audiologist stating that Rizzo could hear emergency vehicles; however, the report failed to address Rizzo's ability to supervise the children while driving the van. Ryan again told Rizzo that CWLC would need confirmation that she could do so safely before again permitting her to drive the children. Ryan then gave Rizzo an "Essential Job Function" list for a teacher (not an administrative assistant) and asked her to have an audiologist evaluate whether she could perform the functions. The list did not specifically mention van driving, but it did state that the employee must be able to assist and supervise the children "in all activities." Moreover, Rizzo was, of course, aware that her ability to drive the van safely was at issue.

Rizzo presented the list not to her audiologist, but to Patricia Cuthirds, an employee of the Texas Rehabilitation Commission, who has no training in audiology. Cuthirds stated that she needed to observe Rizzo at work to determine whether she could perform the functions listed, and Rizzo so informed Ryan. Neither Cuthirds nor an audiologist ever observed Rizzo at work and no further report on Rizzo's ability to hear a choking child or otherwise supervise the children while driving the van was ever sent to CWLC, although there is some disagreement as to why not. CWLC contends that Rizzo purposefully delayed in obtaining the audiologist's on-site evaluation. Cuthirds testified that she was told by Rizzo that she did not want Cuthirds to observe her because she did not want to "rock the boat." Furthermore, CWLC employees testified that they emphasized to Rizzo that she could bring in her audiologist to work to observe her. In contrast, Rizzo testified both that she told Cuthirds "not to worry about" coming to observe her but that she would check into the need to do so, and that Ryan told her that the additional testing "was no longer necessary." Rizzo further

incident, the parent described it as occurring in May 1993, rather than in February 1993. Rizzo admits, however, that in her February 1993 conversation with Ryan, after which Ryan removed her from van driving duties, Ryan informed her of the complaint.

16

testified that (1) she did not know why Ryan would have told her that she no longer needed to get additional testing, and (2) she never asked Ryan why such would be the case or followed up this conversation in any way.

Rizzo resigned from her position with CWLC in May 1993. In the exit interview, Claudia Adame, Ryan's immediate supervisor, asked Rizzo what CWLC could do to keep her with them. Rizzo responded that "nothing could be done" and that her "mind had been made up." She testified at trial that she had determined that, "even if all the tests came back to prove that [she] was qualified," she did not believe that CWLC would reinstate her driving duties. Rizzo brought the present suit later that month.

II.

Merits

A.    Standard of Review

We review de novo the denial of a motion for judgment as matter of law ("JML"), viewing all evidence in the light most favorable to the non-moving party.[28] The decision to grant JML "is not a matter of discretion, but a conclusion of law based upon a finding that there is insufficient evidence to create a fact question for the jury."[29]

B.    ADA's Interactive Process

1.    Statutory Structure

To understand why I believe Rizzo's claim fails, it is necessary to review the basic outlines of the ADA's statutory framework. Under the Act, the general rule is that an employer shall not "[1]

---

[28]Burroughs v. FPP Operating Partners, L.P., 28 F.3d 543, 546 (5th Cir. 1994).

[29]In re Letterman Bros. Energy Sec. Litig., 799 F.2d 967, 972 (5th Cir. 1986)).

17

discriminate against [2] a qualified individual with a disability [3] because of the disability . . . ."[30] Addressing these requirements in reverse order, a "disability" includes a physical or mental impairment that substantially limits one or more of an individual's major life activities.[31] CWLC grants that Rizzo's hearing impairment constitutes a disability. It is important to note, however, that the ADA requires employers to accommodate limitations, not disabilities.[32] "The determination of whether an individual has a disability is not necessarily based on the name or diagnosis of the impairment the person has, but rather on the effect of that impairment on the life of the individual."[33]

With regard to the second requirement, a qualified individual is one who can perform the essential functions of the job held with or without reasonable accommodation.[34] The ADA, however, permits an employer to impose qualification standards that tend to screen out the disabled so long as those standards are shown to be "job- related" and "consistent with business necessity."[35] Such qualifications standards "may include a requirement that an individual shall not pose a direct threat to the health or safety of other individuals in the workplace."[36] The Act defines "direct threat" as meaning "a significant risk to the health or safety of others that cannot be eliminated by reasonable

---

[30]42 U.S.C. § 12112(a).

[31]42 U.S.C. § 12102(2).

[32]See Taylor v. Principal Financial Group, Inc., 93 F.3d 155, 164 (1996).

[33]29 C.F.R. 1630.2(j), App. (1995).

[34]See 29 C.F.R. § 1630.2(m).

[35]42 U.S.C. § 12112(b)(6).

[36]42 U.S.C. § 12113(b) (emphasis added).

18

accommodation."[37]

Finally, the ADA defines discrimination as including an employer's failure to make "reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability . . . unless such [employer] can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such [employer] . . . ."[38] In general, "it is the responsibility of the individual with the disability to inform the employer that an accommodation is needed."[39] Once the employee makes such a request, "[t]he appropriate reasonable accommodation is best determined through a flexible, interactive process that involves both the employer and the qualified individual with a disability."[40]

Thus, once an accommodation is properly requested, the responsibility for fashioning a reasonable one is shared between the employee and employer. This is only logical, as an employee will typically have better access to information concerning his limitations and abilities whereas an employer will typically have better access to information regarding possible alternative duties or positions available to the disabled employee. Fitting these two halves into a whole, the employer and employee can work together to determine how best to restructure the employee's duties and work place in a manner that accommodates the employee's limitations but does not pose an undue hardship on the employer. If, at the end of this process, the employer fails to provide the disabled employee

---

[37]42 U.S.C. § 12111(3).

[38]42 U.S.C. § 12112(b)(5)(A).

[39]29 C.F.R. § 1630.9, App. (1995).

[40]Taylor, 93 F.3d at 164 (quoting 29 C.F.R. § 1630.9, App. (1995)).

a reasonable accommodation, it is liable under the ADA.[41]  On the other hand, if the <u>employee</u> does not participate in the process in good faith, he is precluded from recovering from the employer.[42]

The Act, therefore, (1) requires an employer reasonably to accommodate known limitations stemming from a disability; (2) permits an employer to take into account safety risks posed by such limitations; and (3) envisions an interactive process between the employer and the employee both at the initial stage when the employee must inform the employer of his disability and any limitations stemming therefrom and request an accommodation, and at the reasonable accommodation stage when the employer and employee must work together to determine how best to accommodate such limitations.

2.        <u>Requirement that Employee Participate in ADA's Interactive Process in Good Faith</u>

As CWLC asserts that it is not liable to Rizzo under the ADA because Rizzo failed to help CWLC determine what, if any, limitations she experienced as a result of her hearing loss, it is the third aspect of the statutory scheme in which we are interested.  In <u>Taylor v. Principal Financial Group, Inc.</u>,[43] we considered a situation very similar to that of the present suit.  There, an employee brought an ADA claim, in which he asserted that his employer had failed reasonably to accommodate his bipolar disorder mental disability.[44]  Although the employee alerted his employer that he suffered a bipolar disorder, he did not identify any limitations that he experienced as a result of the condition.[45]

---

[41]42 U.S.C. § 12112(b)(5)(A).

[42]<u>See</u> <u>infra</u> notes 22-35 and accompanying text.

[43]93 F.3d 155 (5th Cir. 1996).

[44]<u>Id.</u> at 159.

[45]<u>Id.</u> at 164.

20

To the contrary, the employee told his supervisor that he was "all right" and that he would be able to meet, and likely exceed, the goals that had been set for him.[46] We held that Taylor could not prevail on his claim,[47] stating that "[w]hen the nature of the disability, resulting limitations, and necessary accommodations are uniquely within the knowledge of the employee and his health-care provider, a disabled employee cannot remain silent and expect his employer to bear the initial burden of identifying the need for, and suggesting, an appropriate accommodation."[48]

The Seventh and Tenth Circuits have similarly held that an employee cannot prevail on his ADA claim if his failure to provide medical information prevented his employer from fashioning a reasonable accommodation. In Beck v. University of Wisconsin Board of Regents,[49] the Seventh Circuit confronted an ADA claim by an employee based on her depression.[50] After the employee supplied her employer with a letter from her doctor stating that she "may require some reasonable accommodation so that she does not have a recurrence of this condition [the depression],"[51] the employer requested that the employee sign a release to allow it to obtain further information.[52] The employee, however, neither signed the release nor attended a meeting scheduled to discuss possible

---

[46]Id. at 159-60.

[47]Id. at 165-66.

[48]Id. at 165.

[49]75 F.3d 1130 (7th Cir. 1996).

[50]Id. at 1132-33.

[51]Id. at 1133.

[52]Id.

21

accommodations.[53] She subsequently brought suit, asserting that her employer had failed reasonably to accommodate her disabilities. The Seventh Circuit held that, by refusing to sign the medical release form or provide the University with sufficient information about her medical conditions, Beck was responsible for the breakdown in the interactive process envisioned by the ADA and thus could not prevail on her ADA claim.[54]

Employing identical reasoning, the Tenth Circuit held in Templeton v. Neodata Services, Inc.[55] that an employee who had refused to provide her employer with certification from her physician that she was physically able to perform the essential duties of her position following an automobile accident in response to the employer's reasonable request for such information was precluded from recovering under the ADA.[56]

3.      Interactive Process and Employer's Legitimate Safety Concerns

In the present case, CWLC too requested that Rizzo provide them with certification that she could perform a function —— safely transporting the children in the van —— that Rizzo admits —— more accurately, insists —— constituted an essential function of her position. The suit, however, diverges somewhat from the above-examined cases in that Rizzo complains not that CWLC failed to reduce or restructure her duties to accommodate limitations she suffers as a result of her hearing loss, but rather that CWLC impermissibly reduced and restructured her duties based on stereotypes and

---

[53]Id.

[54]Id. at 1137; see also Steffes v. Stephan Co., 144 F.3d 1070, 1073 (7th Cir. 1998) ("Because [employee] failed to hold up her end of the interactive process by clarifying the extent of her medical restrictions, [employer] cannot be held liable for failing to provide reasonable accommodations.").

[55]162 F.3d 617 (10th Cir. 1998).

[56]Id. at 619.

generalizations.  Thus, whereas in <u>Taylor</u>, <u>Beck</u>, and <u>Templeton</u>, the question of the employer's

liability centered on what the employer had <u>failed to do</u>, here the question of CWLC's liability hinges

on what CWLC <u>actually did</u>.

This is a potentially significant distinction.  The ADA does not permit an employer to make

adverse employment decisions based solely on the fact that an employee has a disability without

determining that the disability affects the employee's ability to perform his essential duties.[57]

Generally, then, an employer must investigate before acting —— that is, before restructuring the

employee's duties in a way that might constitute an adverse employment decision —— rather than

the reverse, as CWLC did here.  Nevertheless, this general rule must give way in a situation in which

the employee's job necessarily entails ensuring the safety of others and the employer has reasonable

grounds for believing that the employee's disability might jeopardize his ability to perform that safety

function adequately.

Such a result flows not only from the structure of the ADA, but from common sense as well.

As stated above, burden of proof issues aside, the ADA permits an employer to require that an

employee not pose a direct threat to the health or safety of others that cannot be eliminated by

---

[57]<u>See</u> <u>Taylor</u>, 93 F.3d at 164 (Policy that employers must not presume that disabled employee
suffers limitations is "supported by E.E.O.C.'s interpretive guide: employers ʻare prohibited from
restricting the employment opportunities of qualified individuals with disabilities on the basis of
stereotypes and myths about the individual's disability.  Rather, the capabilities of qualified individuals
must be determined on an individualized, case by case, basis.'") (quoting 29 C.F.R. 1630.5, App.
(1995)); <u>Teahan v. Metro-North Commuter R. Co.</u>, 951 F.2d 511, 515 (2d Cir. 1991) ("An employer
obviously may not assume that because a person has a handicap, he or she is unable to function in a
given work context.
Although the Act forbids discrimination based on stereotypes, an employer is entitled to make
employment decisions based on ʻactual attributes of the handicap.'").

23

reasonable accommodation.[58] Moreover, although the language of the ADA does not mandate that an employer conduct a pre-termination or pre-duty restructuring investigation, it certainly encourages such investigations by requiring that an employer take no action with regard to a disabled employee based on uneducated generalizations and stereotypes.[59] Indeed, the EEOC advises that "the employer must <u>determine</u> whether a reasonable accommodation would . . . eliminate" the direct threat[60] —— a determination the employer will often only be able to make after investigating the employee's capabilities and limitations.

It follows that, during the period that such an investigation is being conducted, the employer must be permitted to assign to other employees, for a reasonable period of time, those duties in which the safety of others was entrusted to the (possibly) disabled employee to other employees. If this were not so, the ADA would be requiring an employer to expose itself to potentially massive liability in an effort not to discriminate on the basis of disability.[61] Even more importantly, if the ADA did not permit an employer to reassign such duties during the course of a reasonable investigation, it would be placing in harm's way all those whose safety is entrusted to the (possibly) disabled employee. There is no evidence that Congress intended to place an employer in such a Catch-22 situation —— either discriminate or endanger your business and the safety of others. To the

---

[58]<u>See</u> 42 U.S.C. § 12113(b).

[59]<u>See</u> <u>supra</u> note 36.

[60]29 C.F.R. S 1630.2(r), 1630.9, Interp. Guidance (emphasis added).

[61]As we have reiterated on several occasions in ADA cases presenting concerns over an employee's ability to drive safely, "[w]oe unto the employer who put such an employee behind a wheel of a vehicle owned by the employer which was involved in a vehicular accident." <u>Chandler</u>, 2 F.3d at 1395 (quoting <u>Collier v. City of Dallas</u>, 798 F.2d 1410 (1986) (unpublished)). In this case, of course, the danger was not so much to other drivers as to the children entrusted to Rizzo's care.

24

contrary, the ADA's clearly-announced recognition of an employer's potential safety concerns belies such a result.

Thus, the ADA's complementary policies of prohibiting unjustified discrimination on the basis of disability, requiring employers to rest their employment decisions on the actual capabilities and limitations of their employees, and permitting employers to factor into their decision-making process legitimate safety concerns dictate that an employer be permitted to remove from an employee an essential duty that necessarily places the employee in charge of the health and safety of others while the employer determines whether any threat exists.

I hasten to emphasize that an employer does not have carte blanche to take any action with regard to an employee whose alleged disability may pose a risk to the safety of others; the employer must always act reasonably under the circumstances. As underscored above, before removing a duty from an employee because of the employee's disability, an employer must have reasonable grounds for suspecting that the employee, in fact, poses a direct threat to the health and safety of others —— a fact-intensive inquiry that must be determined on a case-by-case basis. If the employer does not have such grounds, the general rule described above, preventing an employer from taking unjustified adverse employment actions against a disabled employee based on stereotypes and generalizations, applies.[62]

Moreover, an employer must conduct its investigation as quickly as practicable, particularly when, as here, the nature of the job is such that the employee is forced to suffer some hardship in terms of hours or pay as a result of the suspension of some of his duties. The ADA permits an employer to remove a duty from an employee while it conducts a reasonable investigation of safety

_____

[62]See supra note 36 and accompanying text.

25

risks. The ADA, however, prohibits an employer from taking an adverse employment action against an employee based solely on the basis of the employee's disability.[63] Again, whether the employer abuses its right to investigate safety concerns either by impermissibly prolonging the investigation or by unnecessarily and unreasonably rearranging the employee's duties during the investigation, thereby crossing the line between reasonable investigation and adverse employment action, will typically be a question of fact.

Nevertheless, when an employer acts on a reasonable concern that the employee cannot safely care for those entrusted to him in the course of his duties and removes such duties from the employee while attempting to determine whether he, in fact, poses a direct threat, the employee must cooperate with the employer's investigation —— just as the case law tells us that he must cooperate with the employer's efforts to fashion a reasonable accommodation.[64] If the employee fails to cooperate —— for example, by refusing to provide the employer with medical information about his condition when the information is uniquely within his control —— he cannot recover under the ADA.[65]

### 4. Rizzo's Claim

When I apply these standards to CWLC and Rizzo, it is clear to me that Rizzo's ADA claims are precluded by her failure to provide CWLC with a report from her audiologist that she could safely supervise the children entrusted to her care while driving the van. First, CWLC had reasonable grounds for removing the van-driving duties from Rizzo. It had received not one but two reports that

---

[63]Rizzo I, 84 F.3d 763.

[64]See supra notes 22-35 and accompanying text.

[65]See id.

children were unable to get Rizzo's attention even though the children were yelling her name to her.[66]

Given the potential risk to the children and others of a driver who might not be able to hear important aural signals or whose attention the children might not be able to get in the case of a safety crisis, CWLC was not unreasonable in seeking to investigate the matter further.[67]

Second, it was not CWLC, but Rizzo, who unreasonably delayed the investigation of the matter. Only Rizzo, in conjunction with her audiologist, could provide the medical information necessary to determine whether she posed a risk to the children.[68] Rizzo, of course, did furnish CWLC with half of the information it requested —— a report that she could hear the sirens of emergency vehicles. Although she testified inconsistently regarding the matter, Rizzo asserts that CWLC prevented her from providing them with the information it had requested. More specifically, Rizzo claims that additional testing regarding her ability to supervise the children "was no longer necessary."

As an initial matter, in a situation such as this in which an employer has temporarily removed a duty from an employee because of safety concerns and the information sought by the employer is of the type that is uniquely within the employee's ability to control, it is far from clear that a single remark to the effect that the employee need not provide the information, made after the employer has

---

[66]See supra note 5 and accompanying text.

[67]Cf. Daugherty v. City of El Paso, 56 F.3d 695 (5th Cir. 1995) (holding insulin-dependent driver was not otherwise qualified individual with disability under ADA); Chandler v. City of Dallas, 2 F.3d 1385 (5th Cir. 1993) (same under Rehabilitation Act).

[68]See Taylor, 93 F.3d at 165 ("When the nature of the disability, resulting limitations, and necessary accommodations are uniquely within the knowledge of the employee and his health-care provider, a disabled employee cannot remain silent and expect his employer to bear the initial burden of identifying the need for, and suggesting, an appropriate accommodation.").

27

admittedly informed the employee that it is just that information that they require to reinstate the removed duty, is sufficient to support a finding that the employer prevented the employee from providing the information. Rizzo did not testify that Ryan forbade her from bringing her audiologist to observe her at work. In fact, Rizzo testified that she did not even question Ryan as to why the information was no longer needed.

Nevertheless, it not necessary to decide the issue based on this single breakdown of interaction. Rizzo admits that, in her exit interview, Adame asked what CWLC could do to keep her from quitting. At that point, because of the type of information involved, the burden was on Rizzo to provide CWLC with proof that she could drive the van and supervise the children safely. Accordingly, she —— not CWLC —— was required to raise the issue of further testing before quitting and seeking to recover for disability discrimination. CWLC reasonably requested specific information to determine whether Rizzo was a direct threat to the safety of the children and, then, at a minimum, reopened the door for her to provide that information at the exit interview. Rizzo, however, chose to leave her position with CWLC because she believed that CWLC would not reinstate her driving duties "even if all the tests came back to prove that [she] was qualified." Her choice forecloses the possibility of recovering under the ADA.

Lastly, within the specific context of temporarily suspending Rizzo's duties to investigate its legitimate safety concerns, CWLC did not unnecessarily or unreasonably rearrange Rizzo's duties. The majority concludes that there is sufficient evidence to support the jury's conclusion that, by removing Rizzo from van driving duties, thereby reducing her hours, and by assigning her to kitchen duty and split shift, CWLC took an adverse employment action against Rizzo. I would agree were this the typical case presenting no direct threat issue; however, if the ADA permits an employer to

28

reshuffle an employee's duties during a reasonable investigation of its legitimate safety concerns, the employer must be allowed temporarily to take actions that would otherwise constitute adverse employment actions. The issue is not whether the employer took action that negatively affects the employee's status —— e.g., reducing his hours or reassigning him to less desirable duties —— it is whether the employer unreasonably and unnecessarily took such action.

Rizzo testified that she felt stigmatized by her new duties and split schedule. She admitted, however, that they were duties shared by all CWLC employees to varying degrees and that others also worked split shifts. She further admitted that she told CWLC that she did not want to work with school-aged children. Essentially, her claim that she suffered an adverse employment action, therefore, turns solely on the fact that CWLC required that she not to drive the van until she proved she could do so safely. That, however, is exactly what the ADA permits CWLC to do. Therefore, as a matter of law, CWLC's decision cannot constitute an adverse employment action.

CWLC had reasonable grounds for temporarily removing Rizzo from van-driving duty while it investigated whether she posed a safety risk to the children or others. CWLC did not treat Rizzo unreasonably during the investigatory period by unnecessarily diminishing her work or pay or assigning her to oppressive duties; and it was not CWLC, but Rizzo, who unnecessarily delayed the investigation. Because Rizzo failed to provide the crucial medical information to CWLC prior to quitting, she is responsible for the breakdown in the interactive process required by the ADA. She is thus precluded from recovering under that Act.

C.    Direct Threat

CWLC and Rizzo disagree as to which party bears the burden on the direct threat issue. CWLC asserts that Rizzo must show that she does not pose a direct threat to herself or others to

29

prove that she is a qualified individual with disability —— as noted earlier, an essential element of her prima facie case.[69] Rizzo counters that, on the contrary, it is CWLC that must prove, as an affirmative defense, that Rizzo constitutes a direct threat.

The statutory text is unclear. It provides that a "qualified individual" is one who can "perform the essential functions of [his] position."[70] An employee who cannot fulfill his duties without harming himself or others would seem unable to perform the essential functions of his position. Moreover, as pointed out above, the ADA permits an employer to impose "qualification standards" that an individual not pose a direct threat to the health or safety of others.[71] The language regarding qualification standards, however, appears in the section of the statute entitled "Defenses,"[72] muddying the waters as to which party bears the burden of proving —— or disproving —— the direct threat contention.

The majority concludes that not only does our holding in Rizzo I that, "[a]s with all affirmative defenses, [CWLC] bears the burden of proving that [Rizzo] is a direct threat"[73] constitute the law of the case, thus deciding the burden of proof issue for the present appeal, but further that the Rizzo I holding correctly states the applicable law. The majority attempts to harmonize the

---

[69]See 42 U.S.C. § 12112(a); Moses v. American Nonwovens, Inc., 97 F.3d 446, 447 (11th Cir. 1996) ("The employee retains at all times the burden of persuading the jury either that he was not a direct threat or that reasonable accommodations were available."), cert. denied, 518 U.S. 1118 (1997).

[70]See 29 C.F.R. § 1630.2(m).

[71]42 U.S.C. § 12113(b).

[72]See 42 U.S.C. § 12113(a).

[73]Rizzo I, 84 F.3d at 764.

30

ADA's apparently conflicting requirements that both the employer and the employee prove their direct threat contentions and to explain the Rizzo I holding with the following framework: Although a plaintiff generally bears the burden of proving that he is not a direct threat to the health and safety of himself and others as part of his prima facie case, when an employer imposes safety standards that tend to screen out individuals with disabilities, the burden of proof on the direct threat issue shifts to the employer.

Although I agree that Rizzo I likely forecloses the burden of proof issue in this appeal[74] ——— an issue that, in my opinion, we need not resolve because, as I set forth above, Rizzo's claim fails at another stage of the analysis ——— I believe that the majority's burden-shifting formula is both incorrect and contrary to our prior case law (at least to our prior case law other than Rizzo I). I, therefore, conclude with my thoughts on the matter.

The first difficulty I have with majority's proposed framework is that, when applied, the exception swallows the rule. Although the majority's scheme assigns the burden on the direct threat issue to the plaintiff as a general matter, in practice, the defendant will always bear this burden of proof. This is so because whenever the question whether the employee poses a direct threat to himself or others arises in a case, it will necessarily raise as a concomitant the issue of the employer's safety standards. Under the majority's rubric, the burden of proof will then shift to the employer. In other words, simply by arguing that the employee could not perform his job safely, the employer will be deemed to have imposed a safety standard. Thus, every time the direct threat question actually comes into play, the defendant will be saddled with the burden of proof, and the general (circumvented) rule of allocating that burden to the employee will fade into the background. If, on

[74]But see infra note 64 and accompanying text.

31

the other hand, the defendant does not raise a defense based on safety concerns, the direct threat issue will simply lie dormant and the putative allocation of the burden of proof to the employee will be meaningless.

For example, in this case, the majority describes CWLC's safety standard as requiring "any teacher whose responsibilities included van driving to be able to discriminate spoken words." That is certainly one component of CWLC's general requirement that its employees perform their jobs safely; and it is, of course, the component of that general requirement implicated by Rizzo's hearing impairment. As Rizzo claims discrimination on the basis of her hearing impairment and CWLC seeks to defend itself by reference to the safety issue, under the majority's conception, CWLC bears the burden of proof. If, however, CWLC did not attempt to defend itself on the basis of safety concerns, Rizzo would bear the burden on an issue left entirely unaddressed by the parties. Thus, although the majority makes a valiant effort to harmonize the ADA's various requirements, its solution, for all practical purposes (and despite the language of the majority's articulated rule), allocates the burden of proof solely to the defendant.

Second, even if the majority's framework did not always result in assigning the burden to the defendant, it will, if adopted, "lead to the anomalous result that there is a lesser burden of proving qualification on a plaintiff where the job involves the care of others, and necessarily entails risk to others, than when the job does not."[75] Such a result flies in the face of the ADA's initial allocation to the plaintiff of proving that he is qualified for the position and the Act's recognition that the employer can (and should) take into account legitimate safety concerns.

Finally, the majority's burden-shifting scheme conflicts with the (at least implicit) holdings of

---

[75]Amego, 110 F.3d at 144.

our pre-Rizzo I cases, Chandler v. City of Dallas,[76] and Daugherty v. City of El Paso,[77] both of which involve the disability discrimination claims of insulin-dependent employee drivers. In Chandler, we held that an employee was not an "otherwise qualified" driver under the Rehabilitation Act because of the risk of danger he posed to himself and others.[78] En route to this conclusion, we noted that the Rehabilitation Act's "definition of qualified handicapped individual [] includes a personal safety requirement —— an otherwise qualified handicapped individual is defined as one who «can perform the essential functions of the position in question without endangering the health and safety of the individual or others.'"[79] Accordingly, we assigned the burden of proof regarding the safety issue to the plaintiff as part of his prima facie case.

Building on Chandler, we similarly held in Daugherty that an insulin-dependent diabetic had not met his burden under the ADA to prove that he was an otherwise qualified driver because of the risk he posed to himself and others.[80] In so doing, we noted that, like the Rehabilitation Act, "the ADA by its own terms recognizes [a] safety requirement" as an integral part of its otherwise qualified individual concept.[81]

In neither Chandler nor Daugherty did we address the specific argument made here by Rizzo that, under the ADA, the employer bears the burden on the direct threat issue because it is an

---

[76]2 F.3d 1385 (5th Cir. 1993).

[77]56 F.3d 695 (5th Cir. 1995).

[78]Chandler, 2 F.3d at 1395.

[79]Id. at 1393 (quoting Chiari v. City of League City, 920 F.2d 311, 317 (5th Cir. 1991)).

[80]Daugherty, 56 F.3d at 697-98.

[81]Id. at 698.

33

affirmative defense. The First Circuit, however, has. In <u>Equal Employment Opportunity Commission v. Amego</u>,[82] the First Circuit concluded that, because the Rehabilitation Act's definition of "qualified individual" specifically addresses the safety issue and because Congress intended the ADA's definition of "qualified individual with a disability" to track closely the definition used in the regulations implementing the Rehabilitation Act:

> [I]t is the plaintiff's burden to show that he or she can perform the essential functions of the job, and is therefore "qualified." Where those essential job functions implicate the safety of others, plaintiff must demonstrate that she can perform those functions in a way that does not endanger others.[83]

I believe that this conclusion is both correct and implicit in <u>Chandler</u> and <u>Daugherty</u>. By expressly modeling the ADA's qualified individual concept after that of the Rehabilitation Act and by defining a qualified individual as an employee who can perform the essential functions of his position, Congress has provided strong evidence that it intended the employee to bear the burden, at least initially, of proving in his prima facie case that he is not a direct threat.

It is at least plausible to advance that an employee bears the burden of proving that, in performing his essential functions, he does not pose a direct threat, but that, if the employee meets this burden, t he defendant can still show as an affirmative defense that the employee represents a direct threat in the performance of his non-essential duties.[84] If such were the case, the ADA's various pronouncements concerning the safety issue would not be in tension.[85] It is not, however,

---

[82]110 F.3d 135 (1st Cir. 1997).

[83]<u>Id.</u> at 144.

[84]<u>See</u> <u>id.</u> at 143-44.

[85]And <u>Rizzo I</u>'s holding that CWLC has the burden of proving its affirmative defense would not necessarily foreclose the conclusion that Rizzo is also required to show that she did not pose a

34

necessary to address whether such a reading is correct here because Rizzo insists that van driving was an essential function of her job with CWLC.

In sum, I believe that the majority's attempt to reconcile the ADA's various and confusing provisions addressing the direct threat issue misses the mark, incorrectly allocating the burden of proof to the defendant either in every case in which the direct threat question is actually at issue or at least in every case in which the employee's job involves the care of others. It seems clear to me, though, that such an allocation cannot be squared either with the Act's requirement that the plaintiff show that he is qualified to perform his essential duties or with our prior case law.

III.

Conclusion

Based upon my thorough review of the ADA's structure and the record in this case, I conclude that, because Rizzo failed to provide CWLC with a report from her audiologist showing that she could safely supervise the children while driving the van despite CWLC's reasonable request for such information, Rizzo cannot prevail on her ADA claim. Rizzo's decision to quit her job prior to providing the requested information constituted a break-down in the interactive process required by the ADA for which she was responsible. Moreover, CWLC's temporary reassignment of Rizzo's van driving duties while it investigated its valid safety concerns cannot constitute adverse employment decision —— a necessary element of Rizzo's prima facie case. Lastly, I am convinced that, at least as an initial matter, an employee bears the burden of proving that he does not pose a direct threat to the health and safety of others when performing his essential duties. I, therefore, respectfully dissent;

---

direct threat in the performance of her essential duties, including van driving, as part of proving that she is otherwise qualified.

35

I would grant CWLC's request for a JML and reverse the verdict for Rizzo.