IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

---

No. 97-20864

---

HERMELA LOULSEGED,

Plaintiff-Appellant,

versus

AKZO NOBEL INCORPORATED;
AKZO CHEMICAL INCORPORATED,

Defendants-Appellees.

---

Appeal from the United States District Court for the
Southern District of Texas, Houston

---

June 16, 1999

Before GARWOOD, DAVIS, and DeMOSS, Circuit Judges.

GARWOOD, Circuit Judge:

Plaintiff-appellant Hermela Loulseged (Loulseged) sued her former employer Akzo Nobel Chemicals, Inc. and its corporate parent Akzo Nobel, Inc. (collectively, Akzo) alleging Akzo had discriminated against her in violation of the Americans with Disabilities Act (the ADA). The case was tried to a jury, and at the close of Loulseged's evidence, the district court granted Akzo's motion for judgment as a matter of law. Loulseged appeals. We affirm.

**Facts and Procedural History**

Loulseged was employed as an analytical laboratory technician in Akzo's Deer Park, Texas, facility. The duties of a lab technician focused on testing chemicals produced at the plant to insure that they were correctly formulated. While most of these duties were performed in the lab, Akzo expected the technicians to perform certain transport type functions. These duties were assigned on a rotational basis, with a single different technician being assigned to this role every week. Since the full complement of technicians fluctuated between eight and nine, Loulseged could expect to be assigned to the transport functions every eight or nine weeks.

The worker on rotation was expected to perform three transport type functions in addition to the usual lab work. First, the laboratory required a supply of chemical solvents. The solvents were stored in a large drum mounted several feet off the ground, located at an area about one hundred yards away from the lab. The person assigned to this task was expected to take a five-gallon container to the storage area, fill up the container, place it in a cart, and return to the lab. When full, the containers weighed thirty to forty pounds. In order to fill the container, some employees had to stoop down. It took several minutes to walk to the storage area. Second, the lab generated waste solvent. This waste solvent was stored in containers that weighed fifty pounds when full. The person on duty was expected to place these containers on carts and move them outside of the lab, where they would be picked up by others. Third, the lab produced samples

contained in small "pepsi" bottles, which had to be moved to the storage area. The on-duty technician would fill a wooden rack with the "pepsi" bottles and transport them to storage.

After working at Akzo for five months, Loulseged injured her back while moving a full waste solvent container. Akzo kept Loulseged's job open for her while she recovered. When she returned, her doctor had placed restrictions on her duties. Loulseged was ordered not to lift more than thirty-five pounds, and not to remain in either a sitting or standing position for extended periods of time. After attempting to clarify the meaning of these restrictions, Akzo made several accommodations for Loulseged. A stool was provided that allowed her to sit on the job. More importantly for the purposes of this appeal, it was agreed that when Loulseged was on transport rotation she would be able to call on the services of the plant's maintenance personnel. These contract workers—outsourced employees of Brown & Root—would perform the actual lifting and transport for all three tasks. Because of concerns about the workers returning with the wrong solvent, however, Loulseged would accompany them to the storage area. Loulseged agrees that this accommodation was reasonable. The Brown & Root workers at some point began to move the sample racks for all employees, not just Loulseged.

In 1993, Loulseged again took medical leave, this time to have back surgery. When she returned, her medical restrictions had been significantly expanded. She was not allowed to lift more than ten pounds, could not perform tasks that required "repetitive" bending

3

and stooping, and could not push or pull carts. These new restrictions did not affect the accommodation of using the contract workers, which Loulseged continued to find reasonable and acceptable. The only problem that developed—involving the stooping required by one of the machines in the lab—was promptly accommodated by Akzo as soon as Loulseged brought it to their attention.

An Akzo employee testified that the use of Brown & Root contract workers to aid the technicians in their transport tasks created problems at the plant. The contract workers found that summons from the technicians disrupted their other work and they complained. In addition, there was a suggestion that the arrangement directly or indirectly raised Akzo's costs. The company decided that in light of these concerns the use of the contract workers by the technicians, including Loulseged, would be terminated. At the time this decision was made, the record indicates that a substantial amount of time remained before Loulseged faced her rotation of transport duties.

In December 1994, Loulseged's supervisor, Carl Wheeler, presented her with a one-gallon container and told her it would be used in the future to transport solvent. She testified that at the time she believed the container was an option to be used by the contract workers. Later, however, she noticed that the employee on rotation was carrying the samples rather than calling on the contract workers. Alarmed, she confronted Wheeler. The gist of this conversation is not in dispute. Loulseged testified that

4

Wheeler told her that technicians could no longer use the contract workers for transportation. When she asked whether the withdrawal applied to her, Wheeler told her it did and that the decision had been made by Wheeler's superiors. At no point did Wheeler indicate the conditions under which Loulseged would be expected to complete her transport rotation, which was not imminent. Wheeler did not mention, nor did Loulseged ask about, the one-gallon container. Loulseged testified that she did not respond in any way to this announcement, and did not raise the issue again. At a meeting of the laboratory technicians that Loulseged attended, Akzo employees discussed the use of a "tricycle"[1] that would substitute for the handcart then used for transport duties. Loulseged's medical restrictions prevented pushing and pulling but did not mention riding. The record indicates Akzo was considering the tricycle at least partially out of a desire to accommodate Loulseged. Loulseged remained silent at the meeting and never spoke to anyone about her disability accommodation afterwards. Later, one week before her rotational duties were scheduled to begin, Loulseged announced her resignation to Akzo in a letter that specifically complained about an unprofessional atmosphere at the lab but did not explicitly reference her disability.

In April 1996, Loulseged filed this lawsuit against Akzo, alleging violation of the ADA grounded in Akzo's alleged refusal to

---

[1] The record does not reveal precisely what kind of vehicle was discussed. At various times it has been referred to as a bicycle and a tricycle. It is also not clear whether the vehicle was pedaled or independently powered.

provide reasonable accommodation for her back injury disability and discrimination on the basis of race. Akzo counterclaimed for the recovery of excess workers' compensation benefits. Prior to trial, Loulseged dropped her racial discrimination claims. The case proceeded to trial before a jury. At the close of Loulseged's evidence, Akzo moved for judgment as a matter of law. In an order issued on September 12, 1997, the district court granted Akzo's motion and dismissed Loulseged's claims. On March 4, 1998, the court below granted judgment for Akzo on its counterclaim. Loulseged appeals only the dismissal of her ADA claim, and does not contest the resolution of the counterclaim.

## Discussion

After a party has been given an opportunity to present its case to the finder of fact, the trial court may grant the opposing party's motion for judgment as a matter of law if there is no sufficient evidentiary basis for a reasonable jury to find for the nonmovant. Fed. R. Civ. P. 50(a)(1). We will affirm a district court's grant of judgment as a matter of law if, viewing the entire record in the light most favorable to the nonmoving party, there is insufficient evidence to allow a reasonable jury to find for the nonmovant. *Burch v. Coca-Cola Co.*, 119 F.3d 305, 313 (5th Cir. 1997). Loulseged argues that there was sufficient evidence in the record to create a jury question as to the reasonableness of the accommodations Akzo provided. She also argues that Akzo's liability may be predicated on its failure to engage in an adequate interactive process with Loulseged to determine what accommodations

6

were necessary. We do not address the first contention and reject the second.

I. Reasonable Accommodation

The ADA requires employers to make reasonable accommodations for disabled employees.[2] 42 U.S.C. § 12112(b)(5)(A). Loulseged argues that Akzo violated the ADA by withdrawing the previous contract worker accommodation and suggesting an inadequate substitute. She asks us to examine the only concrete proposal made by Akzo—the use of a one-gallon, rather than five-gallon container—in isolation and maintains that there was a jury question as to its reasonableness. Generally, claims that an employee has been denied a reasonable accommodation are accompanied by claims the plaintiff was not hired, not promoted, or discharged or demoted. However, it is perhaps arguable that the failure to accommodate an employee standing alone may give rise to a claim under the ADA. *Cf. Penny v. United Parcel Service*, 128 F.3d 408 (6th Cir. 1997) (considering before ultimately rejecting claim when plaintiff remained with employer in the same position at the commencement of litigation). We do not reach that question, nor that of whether (absent constructive discharge, which is not made out here) an employee who quits her job may sue for loss of employment when only failure to accommodate, but no other adverse employment action, is shown. We proceed on the *arguendo* assumption

---

[2]    At oral argument, Akzo argued that Loulseged did not qualify as disabled under the ADA. This was not the ground on which the district court granted judgment as a matter of law, and our resolution of the case makes it unnecessary to address this contention.

that the fact that Loulseged quit her job does not, *per se*, bar her action.  However, her quitting under these circumstances complicates the analysis.  Because Loulseged quit before her rotation was imminent, we are forced to engage in a somewhat hypothetical enterprise—determining what accommodation or lack thereof would have been forthcoming had Loulseged remained at the company until the final arrangement was revealed.

Insofar as Loulseged asks us to find that a reasonable jury could attach liability to Akzo on the grounds that the one-gallon container proposal standing alone was inadequate, we cannot.  It is difficult to judge the reasonableness of accommodations when the employee withdraws before we can say with any authority what these accommodations would have been.  In an ordinary case of this sort, the finality of an accommodation can usually be presumed—generally because the employer took some concrete adverse employment action such as terminating the employee (or refusing to hire the applicant for employment), which emphatically signals that no further accommodations will be made.  In this case, however, the employee quit.[3]  While given the danger of physical injury we might be inclined to view the one-gallon proposal as a final accommodation if Loulseged had been ordered on the first day of her rotation to

---

[3]    Loulseged's brief, in an attempt to avoid the problems caused by her abrupt resignation, argues that she was constructively discharged.  Nothing in the record even hints at the type of conditions that would allow a jury to make such a finding. Recognizing this, Loulseged argues that the constructive discharge threshold is somehow lowered in ADA cases.  The case she cites for this proposition indicates nothing of the sort.  *See Cooper v. Neiman Marcus Group*, 125 F.3d 786, 791 (9th Cir. 1997) (employer actually discharged employee).

8

perform the transport tasks and no other accommodation was made—she would not have been required to actually attempt the work unaided to assert that reasonable accommodation was denied—she chose to quit a week *before* the earliest time she might have been asked to perform these duties. Given this time frame, we believe it is impossible to judge the offer of a one-gallon container as being the beginning and end of Akzo's substitute accommodations. Had she not quit, Akzo might have provided her with a squadron of Olympic weightlifters and a Mercedes-Benz chemical transport vehicle to aid her in her tasks. It also might have ordered her on pain of termination to move fifty-pound containers unaided. Because of Loulseged's decision to quit, we simply cannot know. We thus decline to analyze the reasonableness of this partial proposal standing alone. What occurred here was not a refusal of Akzo to reasonably accomodate Loulseged's concerns, but a breakdown in the interactive process designed to create those reasonable accommodations.

II. Failure to Engage in the Interactive Process

Loulseged also argues that judgment as a matter of law was inappropriate because a jury question existed as to Akzo's failure to initiate and participate in an interactive process with her to develop a reasonable accommodation. Akzo concedes that it was under an obligation to participate in such a process, but argues that the failure of the process to develop an accommodation was traceable to Loulseged's noncooperation. Once an employee has made

9

a request for an accommodation,[4] the ADA's regulations state that "it may be necessary for the [employer] to initiate an informal, interactive process with the qualified individual with a disability in need of the accommodation" in order to craft a reasonable accommodation.  29 C.F.R. § 1630.2(o)(3).  The EEOC's interpretive guidelines reinforce this directive, but also stress that the interactive process requires the input of the employee as well as the employer.  *See* 29 C.F.R. Pt. 1630, App. §1630.9 at 359 ("flexible, interactive process that involves both the employer and the qualified individual with a disability").  *See also Taylor v. Principal Finance Group, Inc.*, 93 F.3d 155, 165 (5th Cir.), *cert denied*, 117 S.Ct. 586 (1996) (duty to launch interactive process is triggered by request for an accommodation).  The need for *bilateral* discussion arises because "each party holds information the other

---

[4]     Employers cannot be expected to anticipate all the problems that a disability may create on the job and spontaneously accommodate them. *See Mole v. Buckhorn Rubber Products, Inc.*, 165 F.3d 1212, 1218 (8th Cir. 1999) ("Only [the employee] could accurately identify the need for accommodations specific to her job and workplace."); *Schmidt v. Safeway, Inc.* 864 F.Supp 991, 997 (D. Or. 1994) (employee cannot "expect the employer to read his mind and know he secretly wanted a particular accommodation"). Accordingly, the burden is on the employee to request an accommodation. *See Burch v. Coca-Cola Co.*, 119 F.3d 305, 320 (5th Cir. 1997); *Taylor v. Principal Finance Group, Inc.*, 93 F.3d 155, 164-65 (5th Cir.), *cert denied*, 117 S.Ct. 586 (1996). Here, Loulseged appears to have requested, and received, an accommodation already and the employer was generally aware of the problems her medical restrictions posed in regard to the transport duties. Under the circumstances of this case, we do not believe that Loulseged was required to formally request a replacement accommodation when the previously agreed on system was withdrawn. However, the imposition of this burden on employees underscores our recognition of the employer's inability to "read minds" and the need for disabled employees to remain active in the development of solutions to their concerns.

10

does not have or cannot easily obtain." *See Taylor v. Phoenixville School Dist*., -- F.3d -- at *16 (3rd Cir. 1999) (noting that employers will not always understand what the disabled employee is capable of and the employee will not always understand what accommodations are reasonably available). Courts interpreting the interactive process requirement have held that when an employer's unwillingness to engage in a good faith interactive process leads to a failure to reasonably accomodate an employee, the employer violates the ADA. *See Taylor v. Phoenixville School Dist.*, --F.3d-- at *19; *Bultemeyer v. Fort Wayne Community Schools*, 100 F.3d 1281, 1285 (7th Cir. 1996).[5] However, recognizing that "the responsibility for fashioning a reasonable accommodation is *shared* between the employee and the employer," *see Principal Finance*, 93 F.3d at 165 (emphasis added), courts have held that an employer cannot be found to have violated the ADA when responsibility for the breakdown of the "informal, interactive process" is traceable to the employee and not the employer. *See Beck v. University of*

---

[5]     We note that both *Taylor v. Phoenixville School Dist.* and *Bultemeyer* involved employees whose disability was mental illness. As those courts recognized, the unique problems presented in some mental illness cases may affect the interactive process. Some mentally ill employees may not be fully aware of the limitations their conditions create, or be able to effectively communicate their needs to an employer. Accordingly, the employer may have an extra duty to explore the employee's condition in these cases and the interactivity of the process may be of less importance. *See Bultemeyer*, 100 F.3d at 1284 ("an understanding of mental illness is central to understanding Bultemeyer's request for accommodation"); *Taylor v. Phoenixville School Dist.*, --F.3d at 14 (noting that medical records available to employer indicated that employee lacked insight into her own condition). When, as here, a disability is purely physical, the employee will generally be in the best position to determine her own needs and capabilities.

11

*Wisconsin Bd. Of Regents*, 75 F.3d 1130, 1135 (7th Cir. 1996); *Templeton v. Neodata Services, Inc*., 162 F.3d 617 (10th Cir. 1998). This reasoning flows naturally from our recognition in *Principal Finance* that responsibility for the interactive process is shared. Since on the evidence here no reasonable jury could find Akzo at fault for the breakdown of the interactive process, the district court was correct to grant judgment as a matter of law in Akzo's favor.

Loulseged first argues that *Beck* imposed an affirmative duty on Akzo managers to sit down with her and comprehensively present a complete proposal for a replacement accommodation as soon as the decision was made to withdraw the contract workers.  We cannot agree.  The regulation's direction to the parties to engage in an interactive process is not an end it itself—it is a means to the end of forging reasonable accommodations.  And the regulations direct an employer to engage in an *informal* process.  Indeed, as the interpretive guidelines and courts have recognized, there may be some situations in which the reasonable accommodation is so obvious that a solution may be developed without either party consciously participating in an interactive process.  See 29 C.F.R. pt. 1630 app. § 1630.9 at 360 (1998); *see also Jacques v. Clean-Up Group, Inc.*, 96 F.3d 506, 514 (1st Cir. 1996) (upholding jury verdict for employer on the grounds that while employer may not have initiated interactive process, a reasonable jury could find that process was not necessary to determine reasonable accommodation).  The process must thus be viewed on a case-by-case

12

basis.  *See Beck*, 75 F.3d at 1136 ("The determination must be made in light of the circumstances surrounding a given case.").

Under the circumstances of this case, where the employee would not be faced with the problematic job duties immediately, Akzo was under no obligation to make a formal presentation to Loulseged at the time of the initial tender of the one-gallon proposal.  Nothing in the regulations or the cases indicates to us that an employer must move with maximum speed to complete this process and preempt any possible concerns.[6]  Instead, we believe that in an informal process the employer is entitled to move at whatever pace he chooses as long as the ultimate problem—the employee's performance of her duties—is not truly imminent.  Here, Akzo came up with a facially reasonable proposal to address one of Loulseged's potential problems, and was mulling another—the tricycle.  In an informal process, these actions would seem to be quite reasonable

---

[6]      The panel in *Beck* noted that a party "that obstructs or delays the interactive process" may be charged with its breakdown. *See Beck*, 75 F.3d at 1135.  In *Beck* and many employment cases, the employee continues working in a capacity arguably needing accommodation while the interactive process is ongoing.  An employer that dragged its feet in that situation could force the employee to work under suboptimal conditions, "simply document the employee's failures," and use the employee's difficulties as an excuse to terminate her.  *See Taylor v. Phoenixville School Dist.*, --F.3d at 19.  An employer's delaying of the process under those conditions might create liability.  There may be other situations in which there is a pressing need to rapidly address the accommodation issue comprehensively.  For example, if the employer knows the employee has been offered another job, delaying the interactive process might indicate the employer was attempting to force the employee to take the other position in order to avoid making a reasonable accommodation.  In this case, however, there was no apparent urgency in crafting accommodations since only a portion of Loulseged's duties presented difficulties and those duties were not yet imminent.  We do not read the language in *Beck* to reach this situation.

13

*preliminary* steps to take. We need not address the question whether they would have been sufficient on their own to establish Akzo's good faith participation in the interactive process, because Loulseged's decision to quit deprived us of the chance to know what further consultations Akzo would have initiated, just as it deprived us of the opportunity to know exactly what accommodations would ultimately have been provided.

Loulseged's characterization of Akzo's initial efforts as "unilateral" is a bit one-sided, given her deafening silence when they were presented to her. No matter how earnestly one party attempts to engage in an interactive process, its efforts can always be superficially characterized as unilateral if the other party refuses to interact. One cannot negotiate with a brick wall. While Loulseged now goes into great detail about the manifest injustice of the one-gallon proposal, she failed to vocalize any of these concerns at the time she allegedly realized that she was expected to use the container. Loulseged also wholly kept her own counsel in regards to the accommodation of her problems with waste solvent and sample transport, even though she testified that she believed these concerns were not addressed. And she continued to remain entirely mute when, in her presence, a potential solution to these problems—a tricycle—was being discussed. Indeed, not only did Loulseged testify that she never mentioned the accommodation issue after her initial conversation with Wheeler, she also made no detailed complaint touching on her disability in her letter

14

announcing her reasons for then quitting.[7]  Akzo can fairly complain that its efforts to begin the interactive process were stymied by Loulseged's stony silence, *see Beck*, 75 F.3d at 1135 ("A party that fails to communicate, by way of initiation *or response*, may . . . be acting in bad faith.") (emphasis added), and her quitting robbed Akzo of a chance to complete the process and demonstrate its good faith.  Thus, so far as is shown by this record, sole responsibility for the breakdown of the process falls on Loulseged.  The process broke down because she stayed silent, and quit.[8]

---

[7]     Loulseged's unwillingness to delve into the alleged discrimination she encountered because of her disability is conspicuous given the fact that she was not shy in expressing her displeasure at the work environment. The letter does not mention her disability in any manner. Instead, she referenced serious interpersonal conflicts on the job as the main reason she felt compelled to quit. Specifically, she complained of "relentless belligerence and unprofessional atmosphere exhaustively perpetuated by the department's CQ manager, vis-a-vis, rumor mongering, name calling, insinuations, denials, etc." In her testimony, Loulseged did not claim that she was ever subjected to rumors, insinuations, or name calling on the grounds of her disability. She did testify, however, that the reference to "denials" in this sentence was a specific reference to the denial of reasonable accommodations for her back problems in regard to the transport of chemicals. This reading is not intuitively obvious and the letter could hardly be expected to put Akzo on notice that it may have been insensitive to Loulseged's insinuation.

[8]     We recently left undisturbed a jury verdict in favor of an employee who resigned from her position in the wake of a job reassignment that she argued was traceable to discrimination against her disability. *See Rizzo v. Children's World Learning Centers, Inc.*, --F.3d-- (5th Cir. 1999). *Rizzo* materially differs from the case before us, as it involved an adverse employment decision, not a claim based solely on an alleged failure to reasonably accommodate. The plaintiff was claiming that she was removed from a position she could perform unaided (driving a school van) and demoted because of prejudice and stereotypes regarding her disability (hearing loss).  She did not claim that she was denied an accommodation that would have allowed her to perform her job.

Loulseged attempts to blunt the force of this argument by maintaining that Wheeler's statements when she originally raised the question of the withdrawal of the contract workers were so uncompromising that she believed further efforts futile. In other words, she seems to argue that it was the presentation of the one-gallon container and the conversation with Wheeler that terminated the interactive process, not Loulseged's quitting. A clear declaration by an employer that no reasonable accommodation will be forthcoming might indeed be seen as terminating the interactive process and removing any duty the employee had to speak up. *See*

The majority in *Rizzo* simply found that the job restructuring could be characterized as a demotion, that a reasonable jury could find that the demotion was motivated solely by plaintiff's disability, and that a reasonable jury could find the plaintiff was qualified to drive the van. *See id.* at *3143-44. The plaintiff's subsequent decision to quit was irrelevant under this analysis, since the discrimination was complete as soon as the plaintiff was reassigned under this analysis. The dissent disagreed, arguing that while an adverse employment decision can generally be looked at in isolation, the special circumstances present when an employee is suspected of posing a direct threat to health and safety allow an employer to temporarily restructure or remove an employee while engaging in investigation to verify whether there actually is a danger. *See id.* at *3151-52 (Wiener, dissenting). It went on to argue that the investigation into whether an employee constitutes a danger should be analogized to the interactive process required when an employee requests a reasonable accommodation, and maintained the jury verdict could not stand since the plaintiff was responsible for the breakdown of this investigative process. *See id.* at *3153-55 (employee failed to produce requested medical documentation before quitting her job). Since the majority clearly rejected the dissent's predicate assumption that the suspicion of a direct safety threat allowed for a temporary restructuring, it did not address the plaintiff's responsibility for the subsequent breakdown of the employer's investigation. *See id.* at *3144 (rejecting employer's argument that it was entitled to balance the safety of the children with the demands of the ADA). Accordingly, the majority opinion cannot be read as an implicit endorsement of the plaintiff's post-demotion conduct and does not affect this case.

16

*Bultemeyer*, 100 F.3d at 1285 (noting that employer announced mentally disabled employee would "not receive any more special treatment" before assigning responsibility for the breakdown to the employer). However, there is no basis for finding that this is what occurred here. In her own testimony, Loulseged admitted that Wheeler never told her that the one-gallon container proposal was a final and unreviewable order, and never told her that further accommodation would be impossible for her concerns about sample and solvent movement.[9] Nor did she even hint in her testimony that the conversation was tinged with menace, accompanied by verbal abuse, or interpreted in light of a pattern of past conduct that would allow her to assume that further discussion would clearly be unfruitful.[10] Nevertheless, she claims that she interpreted Wheeler's conduct as rendering any further discussion futile. In particular, she focuses on the fact that Wheeler told her that the

---

[9]     "Q. . . . .[N]o one said 'okay. The Brown & Root people are gone, and, Ms. Loulseged, you're going to have to go back and lift everything that Brown & Root has been lifting for you'?
    A. [Loulseged] No.
    Q. You just assumed that because the Brown & Root people were not there, you were going to have to do that?
    A. Yes.
    Q. And then you quit?
    A. Yes."

[10]    Indeed, Loulseged testified that she had a good relationship with Wheeler and wrote him a brief handwritten note thanking him when she quit. Moreover, she admitted that Akzo had promptly responded to her previous requests for accommodation in her daily lab duties. To the extent that Loulseged asks us to find that a reasonable jury could infer that Akzo was a callous and authoritarian workplace where decisions from higher-ups could not be questioned, she not only failed to introduce any evidence that this was so, but has foreclosed her own argument.

17

decision had been made by higher authorities.

We cannot question Loulseged's subjective belief on appeal. But while the *Beck* court talked in general terms about "good faith," we do not believe this language was intended to, or that the law should, place the success of the interactive process at the mercy of either party's subjective beliefs. *See Harter v. University of Indianapolis*, 5 F.Supp. 2d 657, 666 (S.D. Ind. 1998) (noting that objective circumstances surrounding the breakdown of the interactive process were the most important factors). *Beck* advises us to "attempt to isolate the cause of the breakdown and then assign responsibility." *Beck*, 75 F.3d at 1135. When a breakdown occurs because an employer creates an objectively reasonable perception that the process is clearly at an end, the employer is as well placed as the employee to avoid the situation. It knows what it said, and how a reasonable person would interpret it, and thus bears responsibility for salvaging the process. But when an employer's statements do not rise to that level, and the breakdown is caused by the subjective spin the employee chooses to place on them, only the employee can prevent the process from collapsing. The employer can hardly be expected to know that the employee is laboring under an unreasonable conviction that further discussion would clearly be futile.

Here, the only rational reading of the conversation is that it at most foreclosed the use of contract workers as an accommodation for Loulseged. Nothing in the record allows a reasonable inference that Akzo clearly would not consider *other* possible accommodations

if Loulseged brought them to its attention.[11]  And nothing in the conversation allowed an inference that the one-gallon container proposal implicitly closed the door on any accommodations of Loulseged's other areas of concern.  There simply was no declaration of finality of accommodation, although there might have been a definitive statement that the use of contract workers would be barred.  Given the lack of clear finality here, no reasonable jury could find that Akzo had ended the informal interactive process at this point.[12]

---

[11]  Portions of Loulseged's brief could be read to argue that the withdrawal of a mutually satisfactory reasonable accommodation standing alone is a violation of the ADA.  This position is untenable, and at oral argument she correctly conceded that an employer is free to withdraw an accommodation as long as the replacement accommodation is reasonable.  The case she cited for the proposition did not involve a situation in which an accommodation was withdrawn and efforts were pending to develop a replacement.  Instead, it involved an employer withdrawing an accommodation and immediately firing an employee. *See Valentine v. American Home Shield Corp.*, 939 F.Supp. 1376, 1400 (N.D. Iowa 1996).

[12]  Perhaps a jury question could have been created if the initial proposal was so manifestly inadequate that it could be interpreted only as an insulting gesture announcing a refusal to make meaningful accommodations—a Marie Antoinette-like "let them eat cake."  Here, however, the one-gallon container proposal did not approach that sort of outrageousness.  Loulseged acknowledged that the one-gallon container was within her ten-pound lifting requirement.  While she claims that the plan would have required her to bend and stoop, it would not be wholly outrageous for Akzo to assume that filling a few containers for a week every nine weeks was not beyond her capacity or to have simply overlooked the bending and stooping problem in focusing on the more evident container size problem.  Her other complaint—that the scheme would have disrupted her work by forcing her to make extra trips—fails to convince us that Akzo's proposal here was tantamount to a contemptuous announcement of a refusal to deal.  The one-gallon container proposal might have been unreasonable—as noted above, we do not reach that question.  The point is that by failing to communicate and abruptly quitting, Loulseged terminated any meaningful development of the proposal.  The interactive process

19

This lack of finality serves to distinguish this case from *Bultemeyer*, which bears a superficial factual resemblance to the situation Akzo faced. *Bultemeyer*, like the case before us, involved a situation in which the parties had reached a mutually satisfactory accommodation for a disability that was subsequently withdrawn. *See Bultemeyer*, 100 F.3d at 1282. However, in *Bultemeyer*, the withdrawal of the previous accommodation (accomplished by transferring the plaintiff to a new post) was accompanied by an explicit announcement that the employee could not expect the type of special accommodation he had enjoyed at his previous position. *See id*. In the same conversation, the employer demanded that the employee report at his new assignment on a specific day on pain of termination. When the employee failed to show up for work on the appointed day, he *was fired*. *See id*. It should be noted that even under those facts, the court felt compelled to note that the employee—whose impairment was mental—made an effort to verify the actual conditions he was expected to operate under, and made an attempt to convey his problems with the proposed work arrangements that was "the best he could do" given his mental condition. *See id*. at 1285.

Here, Loulseged—who suffered from a physical, not a mental, disability and was not fired but quit—was not presented with any statement that could be reasonably interpreted as clearly

---

requirement is designed to address precisely these kinds of situations, where a proposal presents problems for employees that may not be obvious to employers or addresses some but overlooks other employee problems.

foreclosing further discussion and announcing the company expected her to perform without a reasonable accommodation. She was never asked to perform under such conditions, and made no effort to determine what conditions she could have expected to encounter when her rotation came due. Nothing was clearly final or settled. Loulseged could have simply waited a few days to see whether further proposals or discussions developed. She also could have at several points vocalized her concerns—thus participating in the informal interactive process—and in the process given Akzo a chance to correct her misperception that further discussion was futile. Instead she chose to quit. The fact that Loulseged may have unreasonably believed the process had terminated, or may have been so attached to the contract worker scheme that she was unwilling to entertain reasonable alternatives, is irrelevant. In light of these undisputed facts, no reasonable jury could find that responsibility for the failure of the process to reasonably accomodate Loulseged rested with anyone but herself. Accordingly, the district court was correct to grant judgment as a matter of law in favor of Akzo. To hold otherwise would reward Loulseged's unilateral withdrawal from a process designed for her own benefit. "[N]either party should be able to cause a breakdown in the process for the purpose of either avoiding or inflicting liability." *Beck*, 75 F.3d at 1135.

### Conclusion

For the reasons stated, the judgment of the district court is

AFFIRMED.