United States Court of Appeals
Fifth Circuit

**F I L E D**

June 10, 2005

Charles R. Fulbruge III
Clerk

IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

---

No. 04-20335

---

KIM R. TULLOS,

Plaintiff-Appellee,

versus

THE CITY OF NASSAU BAY; ET AL,

Defendants,

THE CITY OF NASSAU BAY,

Defendant-Appellant.

---

Appeal from the United States District Court
for the Southern District of Texas

---

Before GARWOOD, BENAVIDES, and STEWART, Circuit Judges.

PER CURIAM:[*]

The City of Nassau Bay, Texas (the City) appeals the judgment

entered upon a jury verdict finding that police officer Kim Tullos

---

[*]Pursuant to 5TH CIR. R. 47.5 the Court has determined that this opinion
should not be published and is not precedent except under the limited
circumstances set forth in 5TH CIR. R. 47.5.4.

(Tullos) was a qualified individual under the Americans With Disabilities Act (ADA) who was terminated from his position because he was perceived to be disabled.  We affirm.

## Facts and Proceedings Below

Tullos became a police officer with the City in 1995.  He began his career as a peace officer in 1969, and had worked for various employers in east Texas, including police and sheriff's departments, county constable and park police departments, and the Department of Veterans Affairs (VA).  In 1994, Tullos had been diagnosed with post-traumatic stress disorder (PTSD) stemming from combat tours in Vietnam between 1965 and 1969.  He had never failed any psychological exam assessing his fitness to be a police officer, however, including the exam required when he began employment with the City.

In March of 2000 Tullos was called to a scene where a woman had reportedly shot herself in the chest.  Tullos tried unsuccessfully to help revive the victim, whom he had previously met.  About three months later, Tullos began having nightmares involving the suicide victim, and felt that his "anger level was up."  On November 15, 2000 he went to see a local psychologist, Dr. George Dempsey (Dempsey), in order to find out why he was having nightmares.  Tullos testified that his first visit with Dempsey took no more than about thirty minutes, and that during this visit Dempsey told him to take some time off from work for further

2

testing. When Tullos asked Dempsey for a letter to justify his taking sick leave, Dempsey instead encouraged Tullos to give him permission to talk to the police chief, Ron Wrobleski (Wrobleski), about Tullos's condition. Tullos agreed to this. After leaving Dempsey's office, Tullos went to his scheduled firearm qualification test, which he passed. He saw his supervisor, Sgt. Anderson, at the firing range, and told Anderson that he would be on leave and that Dempsey would explain to Wrobleski.

A day or two later, Wrobleski called Tullos and told him to come to Wrobleski's office with his badge. Wrobleski handed Tullos a memorandum purporting to relate a telephone conversation between Wrobleski and Dempsey, and informing Tullos that he was thereby relieved of all law enforcement authority and placed on administrative leave. The memorandum indicated that Dempsey had determined that Tullos was depressed and suffering from PTSD, and that he additionally had "an impulse control disability coupled with a rage disorder." The memorandum further stated "that in [Dempsey's] professional opinion, these conditions coupled with the PTSD are rendering you in a condition in which, under certain situations or stimulation, your behavior would become unpredictable and pose a real danger to yourself or potentially those you were dealing with." Stating that "[a]t the present time, Dr. Dempsey has determined that your mental and psychological conditions are not conducive to your active and daily performance of the duties of a police officer," the memorandum then states that Tullos was being

3

placed on non-disciplinary administrative leave.  The leave is described as "continu[ing] until such time that a prognosis is reached confirming your fitness and suitability to return to work in the field of law enforcement."[1]

---

[1]The memorandum, dated November 17, 2000, reads as follows:
"On Wednesday, November 15, 2000 at approximately 4:35 p.m., I received a telephone call from Sergeant Tim Anderson of the Nassau Bay Police Department.  Sergeant Anderson stated that he had been contacted by you at which time you informed him of the following:
- That on your own [you] had visited a Dr. George Dempsey, known to be a local licensed psychologist, for a personal problem;
- That Dr. Dempsey had instructed you to go home and not perform any law enforcement duties until further notice or authorization from him; and,
- That if the department required any further information that we were to call Dr. Dempsey.

At 3:20 p.m. on Thursday, November 16, 2000, I called Dr. Dempsey at his office at which time he related the following:
- That he had examined you during which time you signed a medical release form permitting him to discuss the nature of your visit and his findings with your employer;
- That following his examination, he instructed you to go home and not perform any law enforcement duties because of the following determinations:
  - That you are depressed and currently suffering from a condition known as Post Traumatic Stress Disorder (PTSD);
  - That you have been undergoing treatment for PTSD through the Veterans Administration Hospital in Houston, Texas and that this treatment has included the use of psychotherapeutic medication;
  - That in addition to the above, that he has also diagnosed you as having an impulse control disability coupled with a rage disorder; and,
  - That in his professional opinion these conditions coupled with the PTSD are rendering you in a condition in which, under certain situations or stimulation, your behavior would become unpredictable and pose a real danger to yourself or potentially those you were dealing with.

The rules and regulations of the Nassau Bay Police Department and those of the Texas Commission on Law Enforcement Officers Standards and Education (TCLEOSE) require that police officers have and maintain certain psychological and mental fitness levels as determined by a licensed psychiatrist or psychologist.  At the present time, Dr. Dempsey has determined that your mental and psychological conditions are not conducive to your active and daily performance of the duties of a police officer.  Therefore, in accordance with Chapter 2, Section 9, paragraph 'C' of the Nassau Bay Police Department rules and regulations manual, I am placing you on non-disciplinary Administrative Sick Leave with pay.  This action is effective immediately and temporary in nature but will continue until

At Wrobleski's instruction, Tullos read and signed the memorandum and turned in his badge. Tullos later testified that he was surprised by the discussion in the memorandum of impulse control and rage disorders, because Dempsey had not mentioned these to him. However, he did not inform Wrobleski of any dispute with the contents of the memorandum.

Over the next few weeks, Tullos had weekly visits with Dempsey and also attended a weekly group therapy session. Tullos testified that Wrobleski called him "a couple of times" during this period, and that Tullos could only tell him that Dempsey still had him on leave and that he was going to therapy. On December 13, Wrobleski wrote a letter to Dempsey expressing concern about Tullos's psychological fitness for being a peace officer, and requesting a diagnosis and prognosis from Dempsey.[2] The letter indicates that

such time that a prognosis is reached confirming your fitness and suitability to return to work in the field of law enforcement.
During this period of leave, you are hereby relieved of all police officer and law enforcement authority as empowered and granted to you by virtue of your employment with the City of Nassau Bay Police Department. This action is being taken in your best interest and in the interest of the city. The city is concerned and views this situation as very serious and this action as necessary and prudent for the purposes of protecting you and the city from any potential litigation.
Your signature below merely confirms that you were given a copy of this memorandum and an opportunity to discuss its contents with the writer."

[2]The December 13, 2000 letter reads as follows:
"Dear Dr. Dempsey,

On Thursday, November 16, 2000, I had a conversation with you regarding the above named patient. The purpose of this conversation was to confirm information forwarded to me by Mr. Tullos concerning his office visit with you on Wednesday, November 15, 2000. Mr. Tullos informed me that he had given you a verbal release of patient confidentiality to allow you to discuss his situation with me.

5

Tullos had advised Wrobleski that he could become a danger to himself or others. Although Wrobleski's November 17 memorandum to Tullos indicated that he would be kept on administrative leave

---

In our November 16 conversation, you confirmed that you had examined Mr. Tullos on the previous day and had determined that he was currently suffering from a Post Traumatic Stress Disorder [PTSD] coupled or compounded by other conditions.

According to Mr. Tullos, you ordered him to go home, not return to work or perform any law enforcement related duties until authorized by you. Tullos advised that this immediate action was necessary due to his state of depression; increased or elevated PTSD coupled with other conditions that might make his behavior unpredictable in certain situations and thereby a potential danger to himself or those he may be dealing with. You also confirmed this.

It is my understanding that Mr. Tullos has maintained a routine office visit and testing schedule with you since my initial discussion with him. Since November 17, Mr. Tullos has been placed on a non-disciplinary administrative sick leave with pay from the department, during which time he has been instructed to not perform any law enforcement duties until released by your office.

As you may be aware, the Texas Commission on Law Enforcement Officer Standards and Education [TCLEOSE] mandates that persons employed as peace officers be psychologically evaluated to determine their fitness and suitability for the profession. Given your preliminary findings, it is my initial belief that Mr. Tullos may currently not be psychologically fit for the performance of the duties of a peace officer. It is therefore necessary that the City evaluate Mr. Tullos' future potential and suitability for continued employment.

In order to assist us in making this evaluating, we are requesting that you to provide us with the following:

- Diagnosis - including current and any pre-existing conditions known by you to be present.
- Prognosis - please discuss the planned treatment along with your assessment of his potential suitability to return to work in the field of law enforcement as a police officer.

Should you have any questions or need clarification about this letter, please do not hesitate to call me. Thank you for your prompt attention to this request.

Sincerely,

Ron Wrobleski
Chief of Police"

Copies of the letter were sent to the city manager, the human resources department, and Tullos's file, but no copy was sent to Tullos.

6

(which did not use up his accumulated sick leave) until a prognosis was determined, Wrobleski instead put Tullos on sick leave on December 19, effective December 11.

On December 26, Dempsey sent a reply to Wrobleski's letter, with a copy to Tullos. By way of prognosis, the reply stated: "Mr. Tullos' condition remains severe and likelihood of return to active police duty is not recommended. It is my clinical opinion that, due to his condition, this disability from police work be permanent."[3]

Tullos testified that Wrobleski called him upon receiving the Dempsey letter and insisted that Tullos either resign or be fired. He did not dispute the conclusion of the Dempsey letter with Wrobleski, however, later testifying that he had been trained in

---

[3]The Dempsey letter reads as follows:
"Dear Chief Wrobleski:

I am in receipt of your letter dated December 14, 2000 requesting clinical diagnosis and prognosis of the above referenced individual. Pursuant to that, please find the following pertinent information:
- Diagnosis: Post Traumatic Stress Disorder exacerbated by traumatic event experienced while on duty April 13, 2000
- This diagnosis is clearly pre-existing to post-Viet Nam war issues and is well documented in Mr. Tullos' medical records. It should be noted, however, that the work-related event referenced above was a clear exacerbation of this condition.
- Prognosis: Mr. Tullos' condition remains severe and likelihood of return to active police duty is not recommended. It is my clinical opinion that, due to his condition, this disability from police work be permanent.

If further information is necessary, please feel free to contact this office.

Sincerely

G.L. Dempsey, Ph.D.
Clinical & Forensic Psychology"

7

the military not to argue with his supervisors. Before replying to Wrobleski, Dempsey had told Tullos during one of their visits that he should give up police work. Tullos did not dispute this point with Dempsey, later testifying that "the first thing they teach you when you go into therapy" is that "you [] don't argue with your therapist." After receiving Dempsey's letter, Tullos expressed concern to Dempsey about possibly being fired, but still did not dispute Dempsey's conclusion.

Sometime during January of 2001 Tullos saw a doctor with the Trauma Recovery Program at the VA hospital. Tullos testified that overcrowding at the VA was such that he could see the VA doctor only every six to eight weeks for about thirty minutes each time. Tullos testified that the VA doctor thought that he would be able to continue working. The VA doctor, Dr. Garza, eventually provided Tullos with a letter in early February of 2001. The letter, which was included in the trial exhibits, opines that the suicide incident exacerbated Tullos's PTSD, but makes no mention one way or the other of his fitness for work. Tullos conceded that he did not provide this letter to the City or in any way inform the City of any opinion contrary to the conclusion of Dempsey's letter.

On January 30, 2001, Wrobleski sent a Termination Memorandum to Tullos, in which he terminated Tullos's position as of January 31, 2001. After relating his version of the events beginning on November 15, 2000, Wrobleski concludes in the memorandum that "it is my belief that you presently do not meet the State's, nor this

8

department's standards for psychological and emotional health. Furthermore, Dr. Dempsey's diagnosis has led me to conclude that you may never be in a satisfactory psychological condition to perform the duties of a peace officer."[4]  The memorandum goes on to

---

[4]The Termination Memorandum reads:

"On Wednesday, November 15, 2000 at approximately 4:35 p.m., Sergeant T.L. Anderson of the Nassau Bay Police Department contacted me.  Sergeant Anderson stated that he had been contacted by [you] earlier that day and that you had informed him that you had been to visit a local psychologist by the name of Dr. George Dempsey.  According to Anderson you had gone to Dr. Dempsey because of some personal problems that you were experiencing.  You later confirmed this during a telephone conversation with me.  Sgt. Anderson further informed me that you had told him that Dr. Dempsey had instructed you to go home and to not return to work until advised by him that you could do so.  Lastly, Anderson related that you told him that the department could call Dr. Dempsey for more information as you had given you verbal authorization for him to do so.

On Thursday, November 16, 2000, around 3:20 p.m. I had the occasion to speak with Dr. Dempsey concerning your visit.  According to Dr. Dempsey, he had examined you and had made the following preliminary diagnosis:

- That you were depressed and suffering from a condition known as Post Traumatic Stress Disorder (PTSD).
- That you had had this condition for some time and previously had been receiving treatment at the Veteran's Administration Hospital in Houston, Texas, and that this treatment included the use of psychotherapeutic medication.
- That in addition to the PTSD condition that you also had an *impulse control disorder* coupled with a *rage* disorder.  Dr. Dempsey believed, in his preliminary diagnosis, that these conditions, coupled with the PTSD had rendered you in a condition in which, under certain situations, conditions or stimulation, your behavior would be unpredictable and you might pose a real danger to yourself and potentially those you were dealing with.

Following my discussion with Dr. Dempsey, I called you at your residence in Nassau Bay at which time you and I had a brief discussion concerning this matter.  During that conversation, you related to me that you were concerned about your condition and worried that you might harm someone if you continued to work your daily shift as a police officer.  You further stated that you had recognized that this condition had been bothering you for some time and that based on Dr. Dempsey's preliminary diagnosis, you believed that your law enforcement career was in danger of ending.

On Friday, Novermber 17, I called you and asked you to come to my office to discuss your situation.  You arrived at around 3:00 p.m. at which time I delivered a prepared memorandum to you, placing you on a non-disciplinary Administrative Relief from Duty until further notice.  Furthermore, because of Dr. Dempsey's assessment of your impulse control and rage condition, I collected your department ID and badge.  You and I

9

discussed the memorandum and my action, to which you stated that you fully understood. You did not voice any objections and stated that you agreed with my actions. Over the next few days and weeks, you and I had occasion to talk on several occasions about your progress. On each occasion, you reported that nothing had changed.

On December 13, 2000, I wrote a letter to Dr. Dempsey asking for a diagnosis and prognosis of your condition. On December 27, 2000, I received a response to my request from Dr. Dempsey. I noted on Dr. Dempsey's response that you were also furnished a copy of this letter. In Dr. Dempsey's response, his prognosis of your conditions was that 'it remains severe and the return to active police duty is not recommended'.

The duties and responsibilities of a peace officer require the ability to deal with a myriad of conditions and situations many of which require clear, unbiased, emotion free decisions. Mental and emotional stability is paramount to the position of a police officer. This quality is supported by the Texas Commission on Law Enforcement Officer Standards and Education through their minimum standards for peace officer licensing that mandates that persons desiring to become peace officers must be declared in writing to be psychologically fit. Section 217.1 (12) of those rules states that 'a person desiring to be a peace officer must be examined by a psychologist who is licensed by the Texas State Board of Examiners of Psychologists, and that the appointee must be declared in writing by that professional to be in satisfactory psychological and emotional health to perform the duties of a peace officer.'

The Nassau Bay Police Department has adopted and incorporated these rules into [its] department policies and further requires that officers maintain a condition of satisfactory psychological and emotional health. In light of Dr. Dempsey's prognosis of your situation, it is my belief that you presently do not meet the State's, nor this department's standards for psychological and emotional health. Furthermore, Dr. Dempsey's diagnosis has led me to conclude that you may never be in a satisfactory psychological condition to perform the duties of a police officer.

I must also inform you that as of the last pay period ending January 21, 2001, you have exhausted all accumulated sick leave. In order to satisfy meeting a minum of 80 hours for payroll purposes, the remaining 49.5 hours of sick leave, plus 16 hours of compensatory time, plus 32 hours of accumulated holiday leave, and 1.5 hours of vacation leave were used. (footnote omitted). As of this time, it will be necessary to debit your accumulated vacation time in order to provide sufficient hours for payroll purposes. Because it is apparent that you will not return to work prior to the balance of your vacation time exhausting, I cannot permit or allow the continued use of vacation time for your absences.

It is for these reasons that I must inform you that your employment with the City of Nassau Bay, Police Department is hereby terminated as a result of being 'unfit' for duty, effective at the close of business on Wednesday, January 31, 2001. I regret that this action must be taken; however, given the circumstances I am unable to identify any other viable alternatives.

In accordance with the City of Nassau Bay's Personnel Policy, employees

state that Tullos's sick leave had been exhausted, that Wrobleski did not expect him to be able to return to work before his vacation leave was exhausted, and that Tullos's employment was therefore being terminated.

As required by Texas law, Wrobleski sent a form to the Texas Commission on Law Enforcement Officer Standards and Education (TCLEOSE) reporting the termination of Tullos's employment. In the portion of the form requiring an "explanation of the circumstances under which the person left the agency," Wrobleski entered "Employee terminated after being declared unfit for continued employment." Tullos was sent a copy of the report with a cover letter informing him that the law allowed him to contact TCLEOSE to contest or explain the information in the report. He testified that he did not do so, however, believing that this would not do any good. TCLEOSE apparently terminated Tullos's certification; Tullos testified that his subsequent attempt to participate in continuing education for peace officers was refused. Tullos also testified that because of the loss of his certification and the circumstances of his termination, he had been unable to find

---

who feel that they have not been treated equitably and fairly in [matters] affecting their employment may file a grievance. In accordance with the City's personnel policy, the City Manager shall supervise and administer the grievance process. A copy of the city's policy on grievances is attached hereto. Lastly, the finance department will be notified to draft a final paycheck to include payment for any unused vacation time. Please contact Mr. Quick's office concerning the availability of that check.

Ronald Wrobleski, Chief of Police"

11

employment, including constable positions and a law enforcement instructor position at a junior college.

After completing the Equal Employment Opportunity Commission (EEOC) charge process, Tullos filed suit against the City and Wrobleski on March 18, 2002, claiming, among other things, that the City violated the ADA by terminating Tullos's employment based on a perceived disability.[5] During a jury trial beginning on January 12, 2004, the City moved for judgment as a matter of law both at the close of the plaintiff's evidence and at the close of the defendant's evidence. Both motions were denied, except for a ruling that punitive damages were unavailable. On January 20, the jury returned a verdict for Tullos on the ADA claim, awarding $166,000 for back pay, lost wages and benefits, and $34,000 for front pay, future lost wages, and future benefits. Specifically, the jury found that Tullos was a qualified individual, that the City regarded him as disabled, and that the perceived disability was a motivating factor in the City's termination of Tullos's employment. The jury further found that the City did not deny Tullos a reasonable accommodation under the ADA. The City appeals the judgment, the denial of its subsequent motion for judgment as a matter of law or new trial, and the award of attorneys' fees and costs to the plaintiff.

---

[5]Tullos's non-ADA claims, including Texas Labor code violations involving worker's compensation benefits and an intentional infliction of emotional distress claim against Wrobleski, were either dismissed on summary judgment or resolved by the jury in favor of the City, and are not discussed further here.

12

## Discussion

The ADA proscribes discrimination with regard to employment "against a qualified individual with a disability because of the disability of such individual." 42 U.S.C. § 12112(a).[6] To prevail on his ADA claim, Tullos had to show that he was qualified to be a police officer at the time of his termination, and that he was terminated because of a disability. Under the EEOC regulations implementing the ADA, a "disability" includes "being regarded as having" an "impairment that substantially limits one or more of [an individual's] major life activities." 29 C.F.R. § 1630.2(g).[7] Tullos argues that the City regarded him as disabled.

The City argues that Tullos was not a "qualified individual" under the ADA, and that even if he was a qualified individual, he was not regarded as disabled by the City. We determine that there was sufficient evidence for a reasonable jury to find that Tullos

---

[6]42 U.S.C. § 12112(a) provides:
"**(a) General rule**
      No covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions and privileges of employment."

[7]29 C.F.R. § 1630.2(g) provides:
      "(g) *Disability* means, with respect to an individual–
      (1) A physical or mental impairment that substantially limits one or more of the major life activities of such individual;
      (2) A record of such an impairment; or
      (3) Being regarded as having such an impairment."

13

was qualified and that the City terminated him because it regarded him as disabled.  We accordingly affirm.

## I.  *Standard of Review*

A motion for judgment as a matter of law made after a jury trial is a challenge to the legal sufficiency of the evidence supporting the jury's verdict.  *Hiltgen v. Sumball*, 47 F.3d 695, 699 (5th Cir. 1995).  This court overturns a jury verdict only if "there is no legally sufficient evidentiary basis for a reasonable jury" to arrive at the verdict.  *Id.* at 699–700; *Johnson v. Louisiana*, 369 F.3d 826, 830 (5th Cir. 2004).

## II. *Was Tullos a "Qualified Individual" Under the ADA?*

A "qualified individual," as defined in the regulations implementing the ADA, is one "who satisfies the requisite skill, experience, education and other job-related requirements of the employment position such individual holds or desires, and who, with or without reasonable accommodation, can perform the essential functions of such position."  29 C.F.R. § 1630.2(m).[8]  That Tullos had the required education and experience to serve as a police

_____

[8]29 C.F.R. § 1630.2(m) provides:
   "(m) *Qualified individual with a disability* means an individual with a disability who satisfies the requisite skill, experience, education and other job-related requirements of the employment position such individual holds or desires, and who, with or without reasonable accommodation, can perform the essential functions of such position.  (See § 1630.3 for exceptions to this definition)."

The exceptions in § 1630.3 involve illegal use of drugs, sexual orientation, sexual behavior disorders, and compulsive gambling, kleptomania, and pyromania.

14

officer is clear. At the time of his termination, he held the highest level of certification ("master") from the TCLEOSE, and he had been a peace officer for most of the previous thirty years.

Regarding his ability to perform the essential functions of the job, Wrobleski testified that Tullos was a satisfactory officer and that there had been no complaints about his performance, either before or after the suicide call. Tullos testified that the nightmares and anger that he sought Dempsey's assistance for were not affecting his job performance. Tullos had been previously found psychologically fit to be a police officer, despite the certifying doctor's knowledge of his PTSD. Given that Dempsey did not testify (in person or by deposition) and was not qualified as an expert, a jury could reasonably find that this evidence outweighed Dempsey's letter.

The City argues that even if Dempsey's evaluation was incorrect, the City cannot be liable under the ADA because Tullos's doctor told the City that he was not qualified, and Tullos never expressed any disagreement with his doctor's opinion. According to the City, the kind of burden that would be placed on the City of unilaterally going against medical advice cannot be the intent of the ADA. This argument does have some appeal. For example, the Sixth Circuit has held that an employee could not be a qualified individual under the ADA when her doctor had not released her to return to work, because the employee consequently could not meet

15

basic attendance requirements for her job. *Gantt v. Wilson Sporting Goods Co.*, 143 F.3d 1042, 1047 (6th Cir. 1998); *see also Pate v. Baker Tanks Gulf South, Inc.*, 34 F. Supp. 2d 411, 416 (W.D. La. 1999). A requirement that a particular doctor release an employee for work would likely be too inflexible, in that it would not account for error or bad faith on the part of the doctor. Another possibility would be to require that the employee at a minimum express to his employer disagreement with a doctor's opinion, if the opinion is to be discounted in determining that the employee is qualified under the ADA.

Such a requirement would be consistent with the emphasis on employer-employee interaction in interpretations of other aspects of the ADA. For example, an employer cannot be liable for terminating an employee on the basis of behavior that is caused by a disability if the employer is not told of the disability (unless the disability has obvious manifestations). *Hedberg v. Indiana Bell Telephone Co., Inc.*, 47 F.3d 928, 932–34 (7th Cir. 1995) ("The ADA does not require clairvoyance."). Similarly, for an employer to be liable under the ADA for failure to accommodate limitations caused by an employee's disability, courts have widely held that the employee must request accommodation from the employer and participate in an "interactive process" with the employer to arrive at a suitable accommodation. *See, e.g., Loulseged v. Akzo Nobel Inc.*, 178 F.3d 731, 735–36 (5th Cir. 1999); *Conneen v. MBNA Am.*

16

*Bank, N.A.*, 334 F.3d 318, 329–30 (3d Cir. 2003); *Bartee v. Michelin N. Am., Inc.*, 374 F.3d 906, 916 (10th Cir. 2004). *But see Bultemeyer v. Fort Wayne Cmty. Schools*, 100 F.3d 1281, 1285–87 (7th Cir. 1996) (employer may carry higher burden in interactive process when employee has mental illness).

We need not, and do not, resolve this issue, however, because the issue was never properly presented to the trial court. The jury was not instructed on the possibility that Tullos could be unqualified even if he did have the requisite skills and education and could perform the essential functions of the job, or on any requirement that Tullos have disputed his doctor's diagnosis. The City cannot claim that the jury instructions were inadequate because it did not object to the instructions. Neither did the City raise in its motions for judgment as a matter of law any argument that Tullos should be found unqualified even if he could perform the essential functions of the job because of his failure to dispute Dempsey's diagnosis. Instead, the City consistently relied on the substance of Dempsey's letter to argue that Tullos in fact could not perform the essential functions of the job. The City's argument that Tullos is essentially estopped from claiming he is qualified because he never disputed his doctor's conclusion to the contrary was therefore not presented below and cannot be considered on appeal.

17

The City also argues that Tullos is blocked by a different form of estoppel: his receipt of Social Security and VA disability benefits. It is true that a sworn inconsistent assertion regarding inability to work made for obtaining disability benefits can negate an assertion that the plaintiff is "qualified" for the purposes of an ADA claim, if the contradiction is not sufficiently explained. *Cleveland v. Policy Mgmt. Sys. Corp.*, 119 S.Ct. 1597, 1603 (1999); *Holtzclaw v. DSC Communications, Corp.*, 255 F.3d 254, 258 (5th Cir. 2001). But "pursuit, and receipt, of [Social Security Disability Insurance] benefits does not automatically estop the recipient from pursuing an ADA claim." *Cleveland*, 119 S.Ct. at 1600. To determine whether Tullos's receipt of disability benefits renders him unqualified for purposes of an ADA claim, we would need to evaluate the specific assertions he made to obtain those benefits, along with his explanation for any inconsistencies. There is no evidence in the record before us as to any particular representations made by Tullos in applying for his benefits. Without evidence of any particular inconsistent assertions that he may have made, we cannot conclude that Tullos could not be considered a qualified individual under the ADA.

Because there was sufficient evidence for a reasonable jury to find that Tullos was able to perform the essential functions of his position, and arguments that he could not be qualified as a matter of law were either not properly presented below or not sufficiently

18

supported by the record, we cannot vacate the jury's finding that Tullos was a qualified individual under the ADA.

### III. Was Tullos Regarded as Having a Disability?

A "disability" is defined by the regulations implementing the ADA as "(1) [a] physical or mental impairment that substantially limits one or more of the major life activities of such individual; (2) [a] record of such an impairment; or (3) [b]eing regarded as having such an impairment." 29 C.F.R. § 1630.2(g). The jury found Tullos to be disabled under the "regarded as" prong, finding that the City regarded Tullos as an individual with a disability. The regulations further define "being regarded as having [a substantially limiting] impairment" as either (1) having an impairment that is not substantially limiting but being treated as if it is, (2) having an "impairment that substantially limits major life activities only as a result of the attitudes of others toward such impairment," or (3) not having an impairment but being treated as having a substantially limiting impairment. 29 C.F.R. § 1630.2(l).[9] The first of these scenarios appears to be at issue in this appeal: Tullos contends that Wrobleski incorrectly treated

---

[9]29 C.F.R. § 1630.2(l) provides:
"(l) *Is regarded as having such an impairment* means:
(1) Has a physical or mental impairment that does not substantially limit major life activities but is treated by a covered entity as constituting such limitation;
(2) Has a physical or mental impairment that substantially limits major life activities only as a result of the attitudes of others toward such impairment; or
(3) Has none of the impairments described in paragraph (h)(1) or (2) of this section but is treated by a covered entity as having a substantially limiting impairment."

his impairment (PTSD) as substantially limiting.[10]  For Tullos to prevail, there must be sufficient evidence for a reasonable jury to conclude that Tullos's impairment, as Wrobleski perceived it, would have substantially limited one of Tullos's major life activities. *McInnis v. Alamo Cmty. Coll. Dist.*, 207 F.3d 276, 281 (5th Cir. 2000); *Deas v. River West, L.P.*, 152 F.3d 471, 476 (5th Cir. 1998).

Tullos argues that Wrobleski perceived him as substantially limited in the major life activity of working.  For this activity, the EEOC regulations provide that "[t]he term *substantially limits* means significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities.  The inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working."  29 C.F.R. § 1630.2(j)(3)(i).  In determining whether someone is restricted from performing a "class of jobs," the regulations contemplate considering the "number and types of jobs utilizing similar training, knowledge, skills or abilities" to the person's former job, in a reasonably accessible geographical area, which are also foreclosed to the person because of his

---

[10]There does not appear to be any dispute that Tullos's PTSD is an impairment, so the third way listed above that one can be regarded as disabled would not apply.  The second scenario, in which the "attitudes of others" cause an impairment to be substantially limiting, involves an employer's taking adverse action against an employee to avoid offending the sensibilities of others, such as coworkers or customers. *See School Bd. of Nassau County v. Arline*, 107 S.Ct. 1123, 1128–29 & nn. 9–10 (1987).  Tullos's termination did not involve the "attitudes of others" in this manner.

20

impairment. 29 C.F.R. § 1630.2(j)(3)(ii)(B). A similar inquiry, but for jobs not utilizing similar training and skills, is contemplated for determining whether a person is restricted from a "broad range of jobs in various classes." 29 C.F.R. § 1630.2(j)(3)(ii)(C). The Supreme Court has summarized these considerations by saying: "If jobs utilizing an individual's skills (but perhaps not his or her unique talents) are available, one is not precluded from a substantial class of jobs. Similarly, if a host of different types of jobs are available, one is not precluded from a broad range of jobs." *Sutton v. United Airlines, Inc.*, 119 S.Ct. 2139, 2151 (1999).

This circuit has little precedent giving examples of what constitutes a "class of jobs." We have held that firefighting, including being a paramedic required to serve as a backup firefighter, is too narrow a field to constitute a class of jobs. *Bridges v. City of Bossier*, 92 F.3d 329, 335–36 (5th Cir. 1996). Other courts have considered the general area of law enforcement to constitute a class of jobs. *Williams v. Philadelphia Hous. Auth. Police Dept.*, 380 F.3d 751, 764–65 (3d Cir. 2004); *McKenzie v. Dovala*, 242 F.3d 967, 971–72 (10th Cir. 2001); *Smaw v. Va. Dept. of State Police*, 862 F. Supp. 1469, 1475 (E.D. Va. 1994). Though we indicated in *Bridges* that the single job of police officer would not constitute a class, *Bridges*, 92 F.3d at 335 (citing *Daley v.*

21

*Koch*, 892 F.2d 212, 215 (2d Cir. 1989)), we have not ruled on whether the area of law enforcement overall is a class of jobs.

The City argues that Tullos was perceived as being limited only in the one particular job of police officer, and was therefore not regarded as disabled by Wrobleski. There was certainly evidence before the jury that Wrobleski considered Tullos's impairment as disqualifying him for the position of peace officer, since Wrobleski's termination memorandum to Tullos emphasized the mental stability requirements for peace officers and stated his conclusion that "you may never be in a satisfactory psychological condition to perform the duties of a peace officer." The position of "peace officer" under Texas law includes, in addition to city police officers, jobs such as constables, park police, county park rangers, arson and fire marshal investigators, and investigators for various state entities such as the commissioner of insurance and the state board of medical examiners. TEX. CRIM. PROC. CODE ANN. § 2.12. The jury could therefore have reasonably found that Wrobleski perceived Tullos's impairment as disqualifying him from more than just police officer positions.

There is also evidence that Wrobleski considered Tullos's impairment as significantly restricting him from work in the overall field of law enforcement. Wrobleski referred in one of his letters to Tullos's "fitness and suitability to return to work in the field of law enforcement." When asked at trial whether Tullos

22

could have performed a police dispatcher position, Wrobleski stated that he "would have been very leery of placing him in that position."[11] Nowhere in Wrobleski's letters or testimony does he describe Tullos's impairment in terms that limit it to police officer work. The jury could have reasonably found that Wrobleski perceived Tullos's impairment as significantly restricting him from employment in the field of law enforcement, which has been found by other courts to constitute a class of jobs under the regulations implementing the ADA.

Even if law enforcement is not considered a class of jobs, there was evidence that Wrobleski considered Tullos's impairment as precluding jobs beyond those in law enforcement. Wrobleski's letters indicated that he believed Tullos to have impulse control and rage disorders, and that "under certain conditions or stimulation" he could "pose a real danger" to himself or others. What these conditions or stimulations might entail was not specified by Wrobleski. During his trial testimony, Wrobleski verified that he had concluded that Tullos's impairment potentially made him a danger to himself and others. When then asked what job such an employee could perform, Wrobleski replied that he had no idea. The jury could reasonably infer that Wrobleski's perception of Tullos's impairment precluded essentially any job involving

---

[11]Wrobleski explained: "Because of his mental condition and the – the communications dispatcher, it's an emergency communications. There's a stress level in there and other factors that are present that I don't think would have been conducive to his mental and physical condition at that time."

23

interaction with others, given that Wrobleski deemed him potentially "a real danger" to himself or others. These foreclosed jobs would constitute significant limitation of employment in a broad range of jobs in various classes. As Tullos testified, with "a rage disorder being put on you, you can't go to work at McDonalds."

There is language in Wrobleski's termination memorandum noting the importance of mental stability for police officers and peace officers, such as "[m]ental and emotional stability is paramount to the position of a police officer." This could suggest a view on Wrobleski's part that police officer and peace officer positions demand a degree of stability not required by other jobs. Even assuming that to be the case, however, Wrobleski did not indicate any belief that Tullos's degree of stability was at a specific level below that required for a peace officer but above that required by other jobs. There is no indication by Wrobleski that the "rage disorder" and potential unpredictability and dangerousness associated with his view of Tullos's impairment were somehow limited to police work. Wrobleski's testimony that he did not know what a rage disorder was and that he had not educated himself on PTSD are also consistent with the jury's concluding that he did not have an especially nuanced view of the extent of Tullos's impairment.

In any event, overall, considering the record as a whole, there was sufficient evidence to support a finding that Wrobleski's

24

perception of Tullos's impairment would significantly limit Tullos from working in either a class of jobs or a broad range of jobs in various classes. There was therefore sufficient evidence to support the jury's finding that Wrobleski regarded Tullos as disabled.

## Conclusion

There was sufficient evidence to support the jury's findings that Tullos was regarded as disabled and that he was a qualified individual under the ADA. Arguments that Tullos cannot be qualified as a matter of law were either not properly presented to the trial court or not sufficiently supported in the record. We must therefore AFFIRM the judgment of the district court.

AFFIRMED